133 F.3d 1159
 28 Envtl. L. Rep. 20,449, 98 Cal. Daily Op.
Serv. 185,
98 Daily Journal D.A.R. 258
 Stella KASZA and John Does, Plaintiffs-Appellants,
v.
Carol M. BROWNER, Administrator, United States Environmental
Protection Agency, Defendant-Appellee.
Stella KASZA and John Does, Plaintiffs-Appellants/Cross-Appellees,
v.
Carol M. BROWNER, Administrator, United States Environmental
Protection Agency, Defendant-Appellee/Cross-Appellant.
Helen FROST; John Does, Plaintiffs-Appellants,
v.
William PERRY, Secretary of United States Department of
Defense; Anthony Lake; Sheila Widnall,
Defendants-Appellees.
Helen FROST; John Does, Plaintiffs-Appellants,
v.
William J. PERRY, Secretary of United States Department of
Defense; Anthony Lake; Sheila Widnall,
Defendants-Appellees.
Stella KASZA and John Does, Plaintiffs-Appellants,
v.
Carol M. BROWNER, Administrator, United States Environmental
Protection Agency, Defendant-Appellee.
Stella KASZA and John Does, Plaintiffs-Appellants,
v.
Carol M. BROWNER, Administrator, United States Environmental
Protection Agency, Defendant-Appellee.
Helen FROST; John Does, Plaintiffs-Appellants,
v.
William J. PERRY, Secretary of United States Department of
Defense; Anthony Lake; Sheila Widnall,
Defendants-Appellees.
 Nos. 96-15535, 96-15537, 96-16047, 96-16892, 96-16895,
96-16930 and 96-16933.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 5, 1997.
Decided Jan. 8, 1998.
 
 Jonathan Turley and Joan Manley, George Washington University, Washington, DC, for plaintiffs-appellants.
 J. Carol Williams, James C. Kilbourne, and Robert L. Klarquist, Department of Justice, Washington, DC, for defendants-appellees.
 Kevin D. Doty, Lionel Sawyer & Collins, Las Vegas, Nevada, for amicus KLAS, Inc.
 Appeals from the United States District Court for the District of Nevada; Philip M. Pro, District Judge, Presiding. D.C. Nos. CV-94-795-PMP, CV-94-00714-PMP.
 Before: WOOD, Jr.,* RYMER, and TASHIMA, Circuit Judges.
 Opinion by Judge RYMER; Concurrence by Judge TASHIMA.
 RYMER, Circuit Judge:
 
 
 1
 Former workers at a classified facility operated by the United States Air Force[1] brought citizen suits under the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. § 6972, against the Air Force (Frost v. Perry ) and the Environmental Protection Agency (Kasza v. Browner ), alleging RCRA violations and seeking to compel compliance with hazardous waste inventory, inspection, and disclosure responsibilities.[2] Finding that the state secrets privilege invoked by the Secretary of the Air Force made discovery and trial impossible, the district court granted summary judgment in favor of the Air Force in Frost. Frost v. Perry, 161 F.R.D. 434 (D.Nev.1995); Frost v. Perry, 919 F.Supp. 1459 (D.Nev.1996). It dismissed Kasza as moot, since inventory and inspection activities were carried out after the action was filed, and the President exempted the operating location near Groom Lake from any hazardous waste provision that would require disclosure of classified information to any unauthorized person. Kasza v. Browner, 902 F.Supp. 1240 (D.Nev.1995). Although we will remand for further consideration of attorney's fees and a sealing order, we otherwise affirm.[3]
 
 
 2
 * Helen Frost, who is the widow of a former worker, and others (proceeding as Does by order of the district court) who worked at a classified operating location near Groom Lake, Nevada, brought a citizen suit pursuant to § 7002(a)(1)(A) of RCRA, 42 U.S.C. § 6972(a)(1)(A). The complaint alleges that the Air Force violated RCRA's federal facility reporting and inventory requirements[4] and committed a number of other violations having to do with the storage, treatment, and disposal of hazardous waste at the site. Frost seeks a declaration that the Air Force failed to perform duties required by RCRA, injunctive relief to restrain the Air Force from incinerating and transporting hazardous wastes in the vicinity of the operating location, civil penalties, and attorney's fees.
 
 
 3
 Once discovery got underway, the Air Force refused to furnish almost all of the information requested on the ground that it was privileged. Dr. Sheila Widnall, the Secretary of the United States Air Force and head of the Department of the Air Force, invoked a formal claim of military and state secrets privilege with respect to the disclosure of certain categories of national security information associated with the operating location near Groom Lake, specifically including "[s]ecurity sensitive environmental data." The claim of privilege was supported by the Secretary's unclassified declaration as well as a classified declaration, which was submitted for in camera review by the district court.[5] In considering additional requests for discovery, the court also reviewed in camera a classified declaration submitted by Air Force Vice Chief of Staff General Thomas S. Moorman, Jr. The district court determined that the state secrets privilege was properly invoked by Secretary Widnall, and that the privilege, as invoked, covered information requested by Frost even though her need for discovery was compelling.
 
 
 4
 The Air Force moved for summary judgment on the footing that the privilege effectively barred the presentation of any evidence tending to confirm or disprove that any hazardous waste had been generated, stored, or disposed of at the operating location near Groom Lake and that the presence (now or in the past) of hazardous wastes at the operating location constituted an essential element of all of Frost's claims for relief. The court concluded that Frost could not establish a prima facie case for any of her claims in light of the national security constraints explained in the declarations. Summary judgment was, accordingly, entered in favor of the Air Force.
 
 
 5
 Meanwhile, Frost sought leave to file an amended complaint, but leave was denied as all of the new claims she wished to assert would be futile. Frost timely appealed.
 
 
 6
 The related Kasza action against the Administrator of the Environmental Protection Agency, a citizen suit under RCRA § 7002(a)(2), 42 U.S.C. § 6972(a)(2), complains that EPA failed to carry out its statutory responsibilities to inspect and conduct inventories at the operating location near Groom Lake, to notify Nevada and the Air Force that they had not provided adequate inventories of environmental information, and to make inspection and inventory information available to the public.[6] The complaint seeks a declaration that EPA has failed to perform acts and duties required by RCRA, and an injunction prohibiting it from violating RCRA's mandatory requirements. In addition, Kasza asks for costs of litigation pursuant to § 7002(e) of RCRA, 42 U.S.C. § 6972(e).
 
 
 7
 The EPA moved for summary judgment based on two unclassified declarations[7] which indicate that from December 6, 1994 to March 10, 1995 (after Kasza was filed), EPA personnel conducted a § 3007(c) inspection of the operating location near Groom Lake; the Air Force had submitted to EPA a final inventory report; and the EPA had completed a final inspection report that was made available to the appropriate (and appropriately cleared) Nevada state officers. The classified inspection and inventory reports were submitted for in camera review by the district court. The EPA also submitted a Memorandum of Agreement between the Air Force and EPA committing both to future RCRA compliance activities for the operating location.
 
 
 8
 The district court held that any effective relief to which Kasza might otherwise be entitled on her inspection and inventory claims was eliminated by EPA and Air Force's post-complaint performance of the inventory and inspection report of the operating location near Groom Lake. Therefore, the district court dismissed those claims as moot. However, the district court denied the Administrator's motion for summary judgment on Kasza's claim that the EPA violated the public disclosure requirements of RCRA by not making the inspection and inventory reports available. The court held that RCRA itself provides no exception for disclosure of classified information, but instead permits the President to exempt federal facilities from compliance with any or all RCRA requirements pursuant to § 6001(a). 42 U.S.C. § 6961(a). Accordingly, it ruled that the EPA had to comply with § 3007(c) but gave the Administrator time to obtain a Presidential exemption. In response to this ruling, the Administrator in fact obtained, and claimed, a Presidential Exemption from any provision that would require disclosure of classified information to unauthorized persons. As a result, the court denied injunctive relief requiring disclosure of the inspection and inventory reports although it did declare that the Administrator had failed to comply with RCRA's public disclosure requirements.
 
 
 9
 Kasza timely appealed. The EPA cross-appealed the district court's decision that §§ 3007 and 3016 mandate the public release of classified RCRA inventory and inspection reports unless the President grants an exemption pursuant to § 6001(a).
 
 
 10
 In related appeals, Frost and Kasza challenge the district court's refusal to disqualify the same team of lawyers from the Environmental Defense Section of the Environment and Natural Resources Division of the Department of Justice (DOJ) from representing both the Air Force and EPA. They also appeal post-judgment rulings that left the transcript of a June 20, 1995 hearing regarding classified material under seal, and that allowed the Environmental Crimes Section of the DOJ's Environment and Natural Resources Division to seek clarification of the court's "Doe" order without formally intervening under Rule 24 of the Federal Rules of Civil Procedure. Finally, Frost and Kasza each appeal the district court's fee determination in their actions.
 
 II
 The Frost Merits Appeal
 
 11
 Frost's appeal centers around how cases involving the relationship between enforcement of environmental protection laws and the assertion of military or state secrets are decided. She argues that the entire regulatory subject matter of a RCRA enforcement action cannot be a state secret, and she faults a process that she believes enables agency heads to invoke and apply the state secrets privilege on a rolling basis, each in turn deferring to the classification decisions of others. She contends that the district court should not have applied the state secrets privilege at all because the privilege is preempted by RCRA's provision for a Presidential exemption when such exemption is in the paramount interest of the United States; but even if the privilege survives preemption, Frost maintains, the claim of privilege in this case was overbroad and could not properly bar all material discovery. In her view, claiming that the existence or nonexistence of hazardous waste is a state secret is absurd. Indeed, she submits, the district court should have considered the fact that an inventory was actually conducted as an admission by the Air Force that hazardous wastes exist at the operating location. And she questions whether the "mosaic theory" upon which the Air Force relies in refusing to disclose even apparently innocuous information (like the name of the operating location or whether any hazardous wastes exist on the site) is permissible.
 
 
 12
 In the same vein, Frost urges that reversal is required because the Secretary could not possibly have personally reviewed all of the information that the Air Force withheld from discovery under claim of privilege, something that she contends is procedurally required to validate the claim. Further, she suggests that the privilege was used to cover up environmental crimes at the operating location near Groom Lake. Moreover, Frost maintains that the district court should not have considered ex parte submissions of classified material or, at least, should not have done so without providing her a redacted version.
 
 
 13
 The Air Force counters that the state secrets privilege, when properly invoked, is absolute and can alone be the basis for dismissal of an entire case, including citizen suits brought under RCRA. Here, the Secretary of the Air Force invoked the privilege, based on her personal knowledge, with respect to security sensitive environmental data and other specific categories of information pertaining to the operating location near Groom Lake. The district court, having properly considered classified declarations and documents in camera, properly concluded that Frost cannot make out a case on any of her RCRA claims.
 
 
 14
 * The state secrets privilege is a common law evidentiary privilege that allows the government to deny discovery of military secrets. In United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), the Supreme Court defined the process through which the government can claim the state secrets privilege:
 
 
 15
 [T]he principles which control the application of the privilege emerge quite clearly from the available precedents. The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party. It is not to be lightly invoked. There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by the officer. The court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect.
 
 
 16
 Id. at 7-8, 73 S.Ct. at 531 (footnotes omitted). The asserted claim of privilege is accorded the "utmost deference" and the court's review of the claim of privilege is narrow: the court must be satisfied that under the particular circumstances of the case, "there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." Id. at 10, 73 S.Ct. at 533; see also In Re United States, 872 F.2d 472, 475-76 (D.C.Cir.1989).
 
 
 17
 The government may use the state secrets privilege to withhold a broad range of information. Although "whenever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter," Ellsberg v. Mitchell, 709 F.2d 51, 57 (D.C.Cir.1983), courts recognize the inherent limitations in trying to separate classified and unclassified information:
 
 
 18
 It requires little reflection to understand that the business of foreign intelligence gathering in this age of computer technology is more akin to the construction of a mosaic than it is to the management of a cloak and dagger affair. Thousands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate.
 
 
 19
 Halkin v. Helms, 598 F.2d 1, 8 (D.C.Cir.1978) (Halkin I ). Accordingly, if seemingly innocuous information is part of a classified mosaic, the state secrets privilege may be invoked to bar its disclosure and the court cannot order the government to disentangle this information from other classified information.
 
 
 20
 Once the privilege is properly invoked and the court is satisfied as to the danger of divulging state secrets, the privilege is absolute: "[w]here there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." Id. at 11, 73 S.Ct. at 533. The application of the state secrets privilege can therefore have three effects. First, by invoking the privilege over particular evidence, the evidence is completely removed from the case. The plaintiff's case then goes forward based on evidence not covered by the privilege. Reynolds, 345 U.S. at 11, 73 S.Ct. at 533-34 (noting that despite the government's use of the state secrets privilege, "it should be possible for respondents to adduce the essential facts as to causation without resort to material touching upon military secrets"); Ellsberg v. Mitchell, 709 F.2d 51, 65 (D.C.Cir.1983) (remanding case to determine if plaintiffs can prove prima facie case without privileged information). If, after further proceedings, the plaintiff cannot prove the prima facie elements of her claim with nonprivileged evidence, then the court may dismiss her claim as it would with any plaintiff who cannot prove her case.
 
 
 21
 Alternatively, "if the privilege deprives the defendant of information that would otherwise give the defendant a valid defense to the claim, then the court may grant summary judgment to the defendant." Bareford v. General Dynamics Corp., 973 F.2d 1138, 1141 (5th Cir.1992); see also Molerio v. FBI, 749 F.2d 815, 825 (D.C.Cir.1984) (granting summary judgment where state secret privilege precluded the government from using a valid defense).
 
 
 22
 Finally, notwithstanding the plaintiff's ability to produce nonprivileged evidence, if the "very subject matter of the action" is a state secret, then the court should dismiss the plaintiff's action based solely on the invocation of the state secrets privilege. Reynolds, 345 U.S. at 11 n. 26, 73 S.Ct. at 534 n. 26; see also Totten v. United States, 92 U.S. (2 Otto) 105, 107, 23 L.Ed. 605 (1875) ("[P]ublic policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated."); Weston v. Lockheed Missiles & Space Co., 881 F.2d 814, 816 (9th Cir.1989) (recognizing that state secrets privilege alone can be the basis of dismissal of a suit). While dismissal of an action based on the state secrets privilege is harsh, "the results are harsh in either direction and the state secrets doctrine finds the greater public good--ultimately the less harsh remedy--to be dismissal." Bareford, 973 F.2d at 1144.
 
 B
 
 23
 We first address Frost's argument that the Presidential exemption provided by § 6001 preempts the state secrets privilege as to RCRA regulatory material. Frost submits that in enacting RCRA, Congress codified an absolute privilege--or exemption--for the President alone to exercise, and thus spoke directly to the question of national security claims. In the case of the operating location near Groom Lake, no President filed an exemption until 1995 and even then, incompletely, unlike, as Kasza points out, President Carter did in 1980 when he completely exempted Fort Allen from RCRA and other environmental laws. See Executive Order 12244, 45 Fed.Reg. 66,443 (Oct. 7, 1980).
 
 
 24
 Section 6001(a) provides that all federal facilities are subject to "all Federal, State, interstate, and local requirements, both substantive and procedural ... respecting control and abatement of solid waste or hazardous waste disposal and management in the same manner, and to the same extent, as any person subject to such requirements...." 42 U.S.C. § 6961(a). Under § 3016(a), each Federal agency must "compile, publish, and submit" to the EPA an inventory of agency-owned sites "where hazardous waste is stored, treated, or disposed of or has been disposed of at any time." 42 U.S.C. § 6937(a). The EPA must also inspect these sites. 42 U.S.C. § 6927(c). Once completed, both reports must be made available to the public. 42 U.S.C. §§ 6927(b) and 6937(a). Section 6001(a), however, grants the President the power to exempt an executive branch facility from compliance with "such a requirement" of RCRA "if he determines it to be in the paramount interest of the United States to do so."[8] 42 U.S.C. § 6961(a).
 
 
 25
 As the state secrets privilege is an evidentiary privilege rooted in federal common law, In re United States, 872 F.2d at 474, the relevant inquiry in deciding if § 6001 preempts the state secrets privilege "is whether the statute '[speaks] directly to [the] question' otherwise answered by federal common law." County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 236-37, 105 S.Ct. 1245, 1252, 84 L.Ed.2d 169 (1985) (quoting City of Milwaukee v. Illinois, 451 U.S. 304, 315, 101 S.Ct. 1784, 1791, 68 L.Ed.2d 114 (1981) (Milwaukee II )). However, "[s]tatutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." United States v. Texas, 507 U.S. 529, 534, 113 S.Ct. 1631, 1634, 123 L.Ed.2d 245 (1993) (quoting Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952)).
 
 
 26
 As recognized by the district court, the state secrets privilege and § 6001 have different purposes: one is an evidentiary privilege that allows the government to withhold sensitive information within the context of litigation; the other allows the President to exempt a federal facility from compliance with RCRA's regulatory regime. Unlike the statutory provisions in Milwaukee II where Congress had "occupied the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency," 451 U.S. at 317, 101 S.Ct. at 1792, RCRA's exemption does not replace in all cases the government's use of a well established evidentiary privilege to withhold sensitive information implicating state secrets from discovery in litigation. At times the purposes of the privilege and the exemption may overlap, but that does not mean that § 6001 "speaks directly" to the existence, or exercise, of the privilege in every RCRA action.
 
 
 27
 Nor does the privilege necessarily parallel the President's power to exempt. If a facility has been exempted, for example, a citizen's suit could question whether the exemption was in the paramount interest of the United States, to which the exemption itself would not apply but to which the state secrets privilege might. Likewise, if a facility hasn't been exempted, but the suit could otherwise go forward based on publicly available inventory and inspection reports and testimony, it might still be the case that disclosure of discrete items of relevant information would affect the national interest.
 
 
 28
 The state secrets privilege has long been "well established in the law of evidence," Reynolds, 345 U.S. at 6-7, 73 S.Ct. at 531, and we discern no Congressional intent to replace the government's evidentiary privilege to withhold sensitive information in litigation by providing an exemption from RCRA's regulation of hazardous waste. Accordingly, we hold that RCRA § 6001 does not preempt the state secrets privilege.
 
 C
 
 29
 We next consider Frost's argument that even if the state secrets privilege is not preempted by § 6001, it was not properly asserted and, even if properly asserted, the Air Force's invocation of the privilege was overbroad. Frost specifically cites the district court's adopting a "mosaic theory" in applying the privilege to generic regulatory information, including the confirmation or denial of hazardous wastes, and allowing the Widnall declaration to cover information the Secretary had never personally reviewed. The declaration itself, she argues, does not seek to withhold information regarding the general existence or absence of chemicals or hazardous wastes, just environmental information that constitutes "security sensitive environmental data." Further, she contends that the court should not have decided to supplant Secretary Widnall's declaration with a subordinate's (the Moorman declaration). Finally, Frost says she was entitled to an explanation as to how the disclosure of information regarding the presence or absence of hazardous wastes would endanger the nation's security.
 
 
 30
 In her unclassified declaration, the Secretary of the Air Force states:
 
 
 31
 This Declaration is made for the purpose of advising the court of the national security interests in and the security classification of information that may be relevant to the above captioned lawsuits [Kasza and Frost ]. The statements made herein are based on (a) my personal consideration of the matter; (b) my personal knowledge; and (c) my evaluation of information made available to me in my official capacity. I have concluded that release of certain information relevant to these lawsuits would necessitate disclosure of properly classified information about the Air Force operating location near Groom Lake, Nevada.
 
 
 32
 Secretary Widnall explains that the Air Force employs the mosaic theory of classification to protect unclassified information "if the combination of unclassified items of information provides an added factor that warrants protection of the information taken as a whole," and that the mosaic theory of classification applies to some of the information associated with the operating location near Groom Lake. Widnall identifies ten categories of information concerning the operating location near Groom Lake that are validly classified: (1) program names; (2) missions; (3) capabilities; (4) military plans, weapons or operations; (5) intelligence sources and methods; (6) scientific or technological matters; (7) certain physical characteristics; (8) budget, finance, and contracting relationships; (9) personnel matters; and (10) security sensitive environmental data. With respect to each, the Secretary asserts a formal claim of the state secrets privilege:
 
 
 33
 It is my judgment, after personal consideration of the matter, that the national security information described in this Declaration and in the classified Declaration, concerning activities at the U.S. Air Force operating location near Groom Lake, Nevada constitutes military and state secrets. As a result, disclosure of this information in documentary or testimonial evidence must be barred in the interests of national security of the United States. Pursuant to the authority vested in me as Secretary of the Air Force, I hereby invoke a formal claim of military and state secrets privilege with respect to the disclosure of the national security information listed in paragraph four of this Declaration [the ten categories of information] and more fully discussed in the classified Declaration, whether through documentary or testimonial evidence.
 
 
 34
 In her unclassified declaration, Widnall states that she is satisfied that the information described in her classified declaration is properly classified and that she has "determined that the information described in the classified Declaration, if released to the public, could reasonably be expected to cause exceptionally grave damage to the national security." Further, she explains, "[i]t is not possible to discuss publicly the majority of information at issue without risking the very harm to the national security that protection of the information is intended to prevent."
 
 
 35
 Here, after actual personal consideration, the person that Reynolds requires to claim the privilege publicly claimed it. Elaborating the basis for the claim of privilege through in camera submissions is unexceptionable. See, e.g., Black v. United States, 62 F.3d 1115 (8th Cir.1995), cert. denied, 517 U.S. 1154, 116 S.Ct. 1541, 134 L.Ed.2d 645 (1996); Zuckerbraun v. General Dynamics Corp., 935 F.2d 544 (2d Cir.1991); Fitzgerald v. Penthouse Int'l, Ltd., 776 F.2d 1236 (4th Cir.1985); Molerio, 749 F.2d at 819, 822; Farnsworth Cannon, Inc. v. Grimes, 635 F.2d 268, 281 (4th Cir.1980) (en banc).
 
 
 36
 Likewise, explaining through a competent official such as Moorman how the claim of privilege plays out in practice is consistent with Reynolds 's insistence that the decision to object be made at the highest level. See, e.g., In re United States, 872 F.2d at 474 (classified declaration of assistant director of the FBI's Intelligence Division submitted for in camera review in support of Attorney General's formal invocation of state secrets privilege); Molerio, 749 F.2d at 821 (suggesting that designee could determine that state secret was implicated in discovery); Halkin I, 598 F.2d at 9 (privilege invoked by Secretary of Defense, supported by in camera testimony of Deputy Director of NSA). In a case such as this, the Secretary, once she has properly invoked the claim of privilege and adequately identified categories of privileged information, cannot reasonably be expected personally to explain why each item of information arguably responsive to a discovery request affects the national interest. See Bareford, 973 F.2d at 1141 (where government does not target documents but objects to a claim that would require disclosure of sensitive information, agency head need only review "type of evidence" necessary to support claim). In sum, in camera review of both classified declarations was an appropriate means to resolve the applicability and scope of the state secrets privilege. No further disclosure or explanation is required. See Reynolds, 345 U.S. at 9, 73 S.Ct. at 532-33; see also Halkin v. Helms (Halkin II ), 690 F.2d 977, 992-95 (D.C.Cir.1982) (rejecting plaintiff's call for greater public showing as unnecessary and unwise).
 
 
 37
 Based on its review of the classified and unclassified declarations, the district court held that the Air Force satisfied the formal requirements necessary to invoke the privilege. After reviewing these same declarations in camera, we agree with the district court that the Air Force properly invoked, and explained, the state secrets privilege. We therefore hold that the Air Force's invocation of the privilege comports with the procedural requirements of Reynolds.
 
 
 38
 We also hold that the scope of the privilege asserted by the Air Force was not overbroad. Based on our in camera review of both General Moorman's and Secretary Widnall's classified declarations, we are satisfied that the Air Force properly employed the mosaic theory of classification and the state secrets privilege to withhold information requested in Frost's various discovery requests. We are convinced that release of such information would reasonably endanger national security interests. See, e.g., Black, 62 F.3d at 1119 ("Our independent in camera ex parte review of the government's state secrets claim similarly convinces us that it was not overbroad."); Halkin I, 598 F.2d at 9 (conclusion that state secrets claim must be upheld from open affidavits reinforced by review of in camera materials).
 
 
 39
 Having determined that the Air Force properly invoked and used the state secrets privilege in Frost, the disclosure of any further information or a trial on Frost's claims risks significant harm to the national security. As the Supreme Court recognized over 120 years ago, "public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated." See Totten, 92 U.S. (2 Otto.) at 107.
 
 
 40
 Not only does the state secrets privilege bar Frost from establishing her prima facie case on any of her eleven claims, but any further proceeding in this matter would jeopardize national security. No protective procedure can salvage Frost's suit. Therefore, as the very subject matter of Frost's action is a state secret, we agree with the district court that her action must be dismissed. See Black, 62 F.3d at 1119 ("The information covered by the privilege is at the core of [the plaintiff's] claims, and we are satisfied that the litigation cannot be tailored to accommodate the loss of the privileged information."); Farnsworth Cannon, Inc., 635 F.2d at 281 ("It is evident that any attempt on the part of the plaintiff to establish a prima facie case would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state secrets precludes any further attempt to pursue this litigation.").
 
 D
 
 41
 As the very subject matter of Frost's action is a state secret, we need not reach her other arguments regarding invocation of the privilege because no matter how they are resolved, there will be no effect on her ability to proceed.[9] The same is true of Frost's request for leave to amend to allege violation of the Comprehensive Environmental Response Compensation And Liability Act (CERCLA), 42 U.S.C. § 9603, and additional violations of RCRA. None could be proved; therefore each is futile.
 
 E
 
 42
 This leaves for resolution only Frost's argument that her motion to disqualify the Air Force's DOJ lawyers was improperly denied. The Environmental Defense Section of the Environment and Natural Resources Division of the Department of Justice assigned the same team of lawyers to defend the EPA in Kasza and the Air Force in Frost. Frost argues that the district court erred when it ruled that any conflict of interest of government counsel is a matter left entirely to the Attorney General.[10] Instead, in her view, DOJ lawyers were in the position of sharing confidential information that may incriminate one client (the Air Force) during an active investigation by the other client (the EPA), and therefore should have been disqualified.
 
 
 43
 We have difficulty seeing how Frost has standing to complain about a possible conflict of interest arising out of common representation of defendants in different civil actions, having nothing to do with her own representation. "As a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification." United States v. Rogers, 9 F.3d 1025, 1031 (2d Cir.1993) (quoting In Re Yarn Processing Patent Validity Litig., 530 F.2d 83, 88 (5th Cir.1976)). The government, however, does not press the point. Regardless, even assuming that Frost does have standing, we see no basis for disqualification. Frost was not a former or current client of the DOJ attorneys whom she wished to disqualify, and she presented nothing more than a conclusory charge of institutional "conflict of interest." Given the absence of any facts indicating that she herself was affected (and, of course, absent any suggestion from the Air Force, or EPA, or their counsel that common representation in separate actions was somehow adverse), there was no need for an evidentiary hearing. Under those circumstances, Nevada Supreme Court Rule 157,[11] upon which Frost relies, is not implicated. Accordingly, the district court did not abuse its discretion, Paul E. Iacono Structural Engineer, Inc. v. Humphrey, 722 F.2d 435, 438 (9th Cir.1983) (indicating standard of review), and there is no reason to remand.
 
 III
 The Kasza Merits Appeal
 
 44
 Kasza focuses on her continuing disagreement about whether the location that she calls "Area 51" is the operating location near Groom Lake. Further, she faults EPA's piggy-backing on the Secretary of the Air Force's invocation of the state secrets privilege in discovery, and the district court's permitting EPA to rely on privileged information in the inventory and inspection reports but denying her access to the material in any form. In addition, she challenges the validity and scope of the Presidential exemption that in her view defers to the classification decisions of others. Kasza also contends that her request for declaratory relief (if not injunctive relief) is not moot, and that the court should have ordered EPA to conduct remedial inspections for prior years. Finally, she submits that the DOJ attorneys representing the Administrator in this case were conflicted because they also represented Perry in Frost.
 
 
 45
 * We disagree with Kasza's view that a genuine issue of fact exists as to the real identity of the location that was involved in the inspection and inventory. Although a viable dispute may linger over the name of the operating location near Groom Lake, no genuine dispute exists as to the place that was the subject of the inventory and inspection. As Breen and Laws state in their declarations, the inspection and inventory occurred at the "United States Air Force operating location near the Groom Dry Lake Bed in Nevada that is the subject of this lawsuit."Kasza likewise questions the veracity of the government's denial that the facility in dispute was ever called "Area 51," and maintains that she should not have been precluded from challenging the credibility of the government's representations. While being denied the tools normally available for testing credibility is understandably frustrating, this is not a normal case. Suffice it to say that the district court could satisfy itself of the credibility of the public declarations in the course of its in camera review of classified materials, and so can we. Having done so, we conclude that summary judgment was not improvidently entered on account of there being any triable issues of fact.[12]
 
 B
 
 46
 Kasza argues that the district court erred as a matter of law in ruling that federal courts do not have jurisdiction to grant declaratory judgment or injunctive relief for past RCRA violations. The district court interpreted RCRA's provision for citizen suits as providing only for prospective relief (not for past violations), under the Supreme Court's opinion in Gwaltney of Smithfield v. Chesapeake Bay Foundation, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). Gwaltney involved § 501 of the Clean Water Act, and Kasza contends that its language, statutory structure and legislative history differ from RCRA's. We do not need to go so far, however, because in our view Kasza's requests for declaratory as well as injunctive relief, whether past or prospective, are moot.
 
 
 47
 A case is moot when the controversy isn't live any longer. Public Utilities Comm'n v. FERC, 100 F.3d 1451, 1458 (9th Cir.1996). Kasza argues that the district court's mootness ruling as to current or on-going violations was in error because the inspection and inventory were conducted for only one year, 1994, which is not determinative as to 1995 or prospective relief for 1996 and beyond. However, the EPA showed through the Breen and Laws declarations that a § 3007 inspection had occurred; that the Air Force had completed a § 3016 hazardous waste inventory and is "adequately providing information to the EPA respecting the operating location near Groom Lake;" and that the state of Nevada is also "adequately providing inventory information respecting the location near Groom Lake." These declarations were supported by the in camera submission of the classified inventory and inspection reports. We agree with the district court that, based on these declarations and the Memorandum of Agreement between EPA and the Air Force with respect to future inventories and inspections, Kasza's request for an order requiring the Administrator to comply with her non-discretionary duties under §§ 3007(a), 3016(a), 3016(b) and 3012(a) is moot.
 
 
 48
 We see no difference between injunctive relief and declaratory relief in this case. In "determining whether a request for declaratory relief ha[s] become moot, ... basically, 'the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " FERC, 100 F.3d at 1458 (quoting Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)). Here, the controversy is EPA's compliance with RCRA's mandatory duties. Non-compliance stopped with the post-complaint inspection and inventory, and the record does not suggest that non-complying conduct is likely to recur. For this reason, nothing is left for effective relief. The case is over.
 
 
 49
 Kasza nevertheless wants a declaration that the EPA has to comply with RCRA to make the point loud and clear; and she wants a declaration that EPA has failed in the past to comply with RCRA so that it can be ordered to create inspection reports for preceding years. For reasons we have already explained (and the district court found in connection with Kasza's request for attorney's fees), the fact that EPA has undertaken to perform inspections at the operating location near Groom Lake (as a result of this lawsuit) shows that it has gotten the point. Nothing remains of sufficient "immediacy" or "reality" about prior years to warrant either a declaratory judgment, or an order requiring "remedial" inspections. See Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-13, 102 S.Ct. 1798, 1802-04, 72 L.Ed.2d 91 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.").
 
 
 50
 Thus, we conclude that Kasza's inventory and inspections claims, and the relief sought in connection with them, are moot and that no declaration with respect to them needs to be made.
 
 C
 
 51
 Even though Kasza's inventory and inspection claims are moot, RCRA also requires the public disclosure of inspection and inventory reports. RCRA §§ 3007(b) and 3016(a); 42 U.S.C. §§ 6927(b) and 6937(a). The district court agreed with Kasza that EPA violated these provisions.[13] In response to that ruling, EPA obtained a Presidential exemption under RCRA § 6001(a). Based on the exemption, the district court found these claims moot as well.
 
 
 52
 Kasza maintains that the district court erred by accepting the September 29, 1995 Determination by President Clinton, which declared:
 
 
 53
 I hereby exempt the Air Force's operating location near Groom Lake, Nevada from any Federal, State, interstate or local provision respecting control and abatement of solid waste or hazardous waste disposal that would require the disclosure of classified information concerning that operating location to any unauthorized person.
 
 
 54
 Presidential Determination No. 95-45, 60 Fed.Reg. 52,823 (Oct. 10, 1995).[14] She argues that the President may only exempt facilities from specific statutory provisions and cannot create a statutory exemption for documents according to their status. By transferring authority to one who simply possesses classification authority and allowing the exemption to apply to any future classified information, Kasza submits that the President has created a "rolling exemption" authority in these individuals, thereby running afoul of RCRA's public disclosure requirement as well as the notification requirement for Congress. Kasza also points out that Congress could have specifically exempted classified information as it did in CERCLA, 42 U.S.C. § 9620(j)(2), but instead chose to allow the President to protect national security through an exemption from "requirements" rather than an exemption based on the status of documents. We disagree that the exemption is invalid.
 
 
 55
 Section 6001 gives the President authority to exempt federal facilities from compliance with "a requirement" if he determines it to be in the paramount interest of the United States to do so. This plainly allows the President to exempt a facility from less than all RCRA requirements which, it would seem, best serves RCRA's purposes as some (though not all) of its requirements are unexempted and will still be met in the case of the operating location near Groom Lake. Here, the President found that "it is in the paramount interest of the United States to exempt the operating location from any applicable requirement for the disclosure to unauthorized persons of classified information." As a practical matter, the President's exemption relates in this case to RCRA's public disclosure requirement. Limiting his determination in this way did not impermissibly relieve the President of his duty to decide that a federal facility should be exempt from a RCRA requirement; President Clinton decided that the operating location near Groom Lake should be exempt, but only to the extent that compliance would require disclosure of classified information to unauthorized persons. That is what the President determined was in the paramount interest of the United States, a matter Congress explicitly left to the President's discretion, and we have no problem with the district court's accepting that determination.
 
 
 56
 Kasza finally argues that the President cannot exempt a facility retroactively to excuse violations in past years or apply a 1995 exemption to withhold unexempted material from prior years. So far as we can tell, he hasn't tried to do so. In any event, we decline Kasza's invitation to remand for the district court to determine the status of regulatory information for prior, unexempted years. As we have already concluded that "remedial" relief of the sort requested is moot, remand would be pointless.
 
 D
 
 57
 Since we hold that Kasza's claims for equitable and declaratory relief were properly dismissed because no effective relief can be granted, we need not consider any other issue that she raises except whether the court should have granted her motion to disqualify defense counsel. On that issue, we decline to reverse for the same reasons explained in Frost.
 
 IV
 The Cross-Appeal in Kasza
 
 58
 The Administrator cross-appeals the district court's decision that §§ 3007 and 3016 require public disclosure of the classified inventory and inspection reports in the absence of a § 6001(a) Presidential exemption. The government's position is that 18 U.S.C. § 793(d), which makes the disclosure of classified information to unauthorized persons a criminal act, necessarily trumps §§ 3007 and 3016.[15] Otherwise, Browner submits, the Administrator of EPA would be on the horns of a dilemma, facing criminal charges if she were to comply with RCRA's duty of disclosure.
 
 
 59
 We decline to address this question, as the Administrator's appeal is moot. Instead of seeking a stay, or other emergency relief from the district court's order before obtaining the Presidential exemption, she elected to seek an exemption, which the President issued on September 29, 1995. While EPA suggests that the controversy isn't moot because the exemption has to be renewed annually and thus is within the exception to the mootness doctrine for questions that are capable of repetition, yet evading review, we disagree. The order was not inherently unreviewable when entered; indeed, the district court gave the government ample time to decide what it wanted to do. See In re Bunker Ltd. Partnership, 820 F.2d 308, 311 (9th Cir.1987) ("The exception [to mootness] was designed to apply to situations where the type of injury involved inherently precludes judicial review, not to situations where the failure of parties to take certain actions has precluded review as a practical matter."). Accordingly, we decline to render what we believe would be an advisory opinion on the relationship between RCRA's disclosure requirements and the classification statutes. Being moot, the cross-appeal must be dismissed.
 
 V
 Post-Judgment Rulings
 
 60
 * Kasza and Frost argue that the district court erred in refusing to order the redaction or unsealing of the transcript of a hearing held June 20, 1995 involving an Air Force manual that they claimed was publicly available but that the Air Force claimed was classified. Early on, the court denied a motion by intervenor KLAS, Inc.[16] to unseal the transcript and related materials, but accepted the government's proposal to redact all matters under seal after the proceedings were concluded. Eventually that happened, but not with respect to the June 20 proceeding. However, we can't tell from the court's later orders whether the June 20 hearing fell between the cracks or whether the court intended its original order to remain in effect. Therefore, we remand for the court to address this issue and, should it determine in its discretion to leave the seal in place, for a statement of reasons. See Hagestad v. Tragesser, 49 F.3d 1430, 1434 (9th Cir.1995).
 
 B
 
 61
 The Environmental Crimes Section of DOJ's Environment and Natural Resources Division sought clarification of the district court's "Doe" orders in both actions so that it could interview present and former workers at the operating location near Groom Lake in the course of investigating whether criminal activity had occurred. Kasza and Frost appeal a number of the district court's rulings related to this issue, but the appeal has been mooted in the meantime. The government submitted a declaration indicating that it has finished its investigation and its file is closed. This ends any live controversy about the issues raised on appeal, and we therefore dismiss it.
 
 VI
 Attorney's Fees
 RCRA § 7002(e) provides:
 
 62
 The court, in issuing any final order in any action brought pursuant to this section ... may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing party or substantially prevailing party, whenever the court determines such an award is appropriate.
 
 
 63
 42 U.S.C. § 6972(e). A plaintiff will be a "prevailing party" if she "succeed[s] on any significant issue in litigation which achieves some of the benefit which the part[y] sought in bringing the suit." Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). A party, however, need not obtain any formal judicial relief to be a prevailing party; rather all that is necessary under the "catalyst test" is that "(1) as a factual matter, the relief sought by the lawsuit was in fact obtained as a result of having brought the action, and (2) there was a legal basis for the plaintiffs' claim." Idaho Conservation League, Inc. v. Russell, 946 F.2d 717, 719 (9th Cir.1991) (quoting Andrew v. Bowen, 837 F.2d 875, 877 (9th Cir.1988)).
 
 
 64
 * The district court found that Kasza was a substantially prevailing party with respect to her inventory and inspection claims as "the relief sought by the lawsuit was in fact obtained as a result of Plaintiffs bringing this action" and the complaint had a legal basis.[17] However, the court awarded fees for only 586 of the 1215 hours requested. We agree with Kasza that the district court should have explained its reduction; otherwise, meaningful appellate review is impossible. We therefore reverse the award of fees and remand for the court to articulate its reasons. Gates v. Deukmejian, 987 F.2d 1392, 1396 (9th Cir.1992).
 
 
 65
 Kasza argues that in addition to being a substantially prevailing party on the inspection and inventory claims, she was a substantially prevailing party on the disclosure claim; this we leave to the district court on remand.
 
 B
 
 66
 The district court ruled that Frost failed to qualify as a substantially prevailing party because she did not obtain or contribute to the relief requested in her prayer, which asked for an order restraining the Air Force from incinerating and transporting hazardous wastes in the vicinity of Groom Lake. Although the court recognized that it could award fees on the catalyst theory, it restricted its analysis to the prayer instead of considering, as it should have, the entire complaint. Frost complained that the Air Force violated its RCRA inventory duties, and sought a declaration to this effect. Without expressing an opinion one way or the other about how the district court should come out on the matter, we remand for it to look anew at " 'what the lawsuit originally sought to accomplish and what relief actually was obtained' " as a practical matter. Idaho Conservation League, 946 F.2d at 719 (quoting Andrew, 837 F.2d at 877).VII
 
 Conclusion
 
 67
 We affirm summary judgment in both Frost and Kasza. We remand for the district court to consider whether to retain the June 20, 1995 hearing transcript and related material under seal, and, if so, to state its state reasons. We dismiss EPA's cross-appeal in Kasza as moot. We also hold that there is no longer a live controversy regarding the district court's decision to clarify its original order allowing the plaintiffs in Frost and Kasza to proceed under fictitious names, and dismiss their appeals on this point as moot. Finally, we reverse and remand the district court's decisions on attorney's fees in both Frost and Kasza.
 
 
 68
 Each party shall bear its own costs.
 
 
 69
 AFFIRMED IN PART; DISMISSED IN PART; REVERSED AND REMANDED IN PART.
 
 TASHIMA, Circuit Judge, concurring:
 
 70
 I concur in all of the majority's opinion, except Part II.B. I also concur in the judgment. I am unable, however, to concur in Part II.B because, first, it is entirely dicta, and, second, were it necessary to reach the issue, I would hold that the RCRA[1] presidential exemption preempts the common law state secrets privilege in those areas where it applies.
 
 
 71
 Part II.B addresses "Frost's argument that the Presidential exemption provided by § 6001 preempts the state secrets privilege as to RCRA regulatory material." This is a false claim that need not be addressed.
 
 
 72
 As the majority opinion points out, the presidential exemption exempts "the disclosure of classified information concerning that operating location" (emphasis added), i.e., the operating location near Groom Lake. Maj. op. at 1173. What the Air Force is withholding, purportedly under the state secrets privilege, is information in ten categories, see id. at 1168-69, that the Secretary of the Air Force says in her unclassified declaration "is validly classified " (emphasis added). See id. at 1168-69 & App. I at p 4. Thus, the Air Force is withholding exactly what the presidential exemption authorizes it to withhold--classified information concerning the operating location near Groom Lake--and nothing more.
 
 
 73
 In this case, there is no conflict between the scope of the statutory exemption and the common law privilege. The only material claimed to be protected by the privilege is classified information; exactly, what the statutory exemption authorizes. Thus, there is no need to decide the hypothetical question tendered by Frost of whether the statutory exemption preempts the common law privilege, and any discussion of this issue is dicta.
 
 
 74
 On the merits of this issue, according to the majority, information that RCRA requires the Air Force to compile and maintain can be excluded from litigation either because a presidential exemption relieves the Air Force of its obligation to make this information publicly available, or because the Secretary of the Air Force believes this information concerns a state secret. In my view, these dual grounds for keeping the same information secret cannot coexist. The presidential exemption and the state secrets privilege have exactly the same purpose: They are both designed to keep state secrets secret. Thus, for the class of information that RCRA requires the Air Force to reveal, the presidential exemption and the state secrets privilege "speak directly" to the same question, namely, what information the Air Force can keep hidden in the name of national security. See United States v. Texas, 507 U.S. 529, 534, 113 S.Ct. 1631, 1634, 123 L.Ed.2d 245 (1993) ("In order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law.") (citations and quotation marks omitted).
 
 
 75
 Accordingly, were we properly to reach the issue, I would hold that the Air Force cannot assert the state secrets privilege to withhold any documents or information, except as authorized by the presidential exemption under RCRA.[2]I.
 
 
 76
 The majority, while correctly recognizing that a federal statute preempts federal common law whenever the two speak directly to the same question, fails to define the relevant "question" with appropriate breadth. In Milwaukee v. Illinois, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), the Supreme Court made clear that a comprehensive regulatory statute can preempt well-established federal common law without even mentioning the common law rules preempted. That case concerned whether the 1972 Amendments to the Federal Water Pollution Control Act preempted the federal common law claim for abatement of nuisance caused by interstate waters. The prior existence of the common law claim was clear and the 1972 Amendments did not specifically say anything about it, so the Court could have applied the rule that statutes in derogation of the common law are strictly construed. Instead, the Court noted that the 1972 Amendments established "a comprehensive program for controlling and abating water pollution." Id. at 319, 101 S.Ct. at 1793 (citation and quotations marks omitted). It concluded that "[t]he establishment of such a self-consciously comprehensive program by Congress ... strongly suggests that there is no room for courts to attempt to improve on that program with federal common law." Id. at 319, 101 S.Ct. at 1793.
 
 
 77
 Milwaukee is instructive because the Supreme Court has similarly described RCRA as "a comprehensive environmental statute that empowers EPA to regulate hazardous wastes from cradle to grave." City of Chicago v. Environmental Defense Fund, 511 U.S. 328, 331, 114 S.Ct. 1588, 1590, 128 L.Ed.2d 302 (1994). The text of RCRA provides a clear means by which federal agencies, such as the Air Force, can protect state secrets from public disclosure under RCRA, i.e., by seeking a presidential exemption. It seems odd for this court to add to this comprehensive regulatory statute yet another means for protecting state secrets, when Congress has not chosen to do so. See Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978) (holding that courts are not free to supplement congressional enactments with federal common law).
 
 
 78
 Our decision in Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127 (9th Cir.1994), is also informative. In Jesinger, we refused to find a common law cause of action under the Federal Credit Union Act (FCUA), 12 U.S.C. § 1751 et seq. Id. at 1131. We did not say that the FCUA was "comprehensive," or that anything in the text of the law addressed whether a private right of action existed. Id. We noted only that the FCUA provided a certain set of remedies and we inferred from this that Congress meant to address the general question of remedies and that we were not free to supplement Congress' answer with our own. Id. at 1131-32. Similarly, RCRA--a statute that goes further than the FCUA and does comprehensively regulate an entire field--explicitly provides a procedure to keep information secret if national security interests are at stake and Jesinger clearly implies that we are not free to supplement Congress' answer with our own.
 
 
 79
 In sum, Milwaukee and Jesinger tell us that in deciding whether a statute preempts federal common law, we must not be too specific in our demand that Congress "speak directly" to the question addressed by the common law. In both of these cases, the statute said nothing about the precise question involved, but the courts found preemption by taking a broad view of congressional goals. With this background in mind, I now turn to the statute involved in the case at bench.
 
 II.
 
 80
 In enacting RCRA, Congress declared "it to be the national policy of the United States that, wherever feasible, the generation of hazardous waste is to be reduced or eliminated as expeditiously as possible." 42 U.S.C. § 6902(b). Perhaps more relevant to this case, Congress added that "[w]aste that is nevertheless generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment." Id. We know that Congress intended RCRA to apply to the Air Force because RCRA says that "[t]he term 'Federal Agency' means any department, agency, or other instrumentality of the Federal Government...." 42 U.S.C. § 6903(4) (emphasis added).
 
 
 81
 RCRA goes on to provide that federal agencies are subject to "all Federal, State, interstate, and local requirements, both substantive and procedural ... respecting control and abatement of solid waste or hazardous waste disposal...." 42 U.S.C. § 6961(a). Also, each agency must submit an inventory to the EPA of agency-owned sites where hazardous waste is stored or treated, 42 U.S.C. § 6937(a), the EPA must inspect these sites, 42 U.S.C. § 6927(c), and the reports must be made public. 42 U.S.C. §§ 6927(b) and 6937(a).
 
 
 82
 A moment's reflection reveals what a huge intrusion RCRA is into the military's traditional ability to keep secrets. According to the language of the statute, the Air Force can no longer simply refuse to acknowledge the existence of military bases in this country or keep silent about everything that goes on there. Now, the Air Force is required to provide the EPA with a great deal of information about its activities and the EPA is required to make this information public.
 
 
 83
 It turns out that Congress appreciated the broad sweep of RCRA and realized that some limits had to be placed on public disclosure, no matter how environmentally beneficial it might be. For that reason, there are two exceptions to RCRA's requirement that inventory reports be made public. The first is mentioned in 42 U.S.C. § 6927(b): The EPA can refuse to reveal part of a report if it would result in a disclosure of information under 18 U.S.C. § 1905, which protects "trade secrets, processes, operations, style of work, or apparatus," as well as other kinds of confidential statistical information. The other exception is the presidential exemption: "The President may exempt any solid waste management facility of any department, agency, or instrumentality in the executive branch from compliance with [any Federal or State solid or hazardous waste law] if he determines it to be in the paramount interest of the United States to do so." 42 U.S.C. § 6961(a). An exemption lasts for only one year, although it may be renewed, and the President must tell Congress every January what exemptions he has issued in the past year. Id. If there were any doubt about why the presidential exemption exists, we could turn to the original House Report on RCRA, which used the phrase "national security interests" in place of "paramount interests." H.R.Rep. No. 94-1491, at 67 (1976), reprinted in 1976 U.S.C.C.A.N. 6238, 6305.
 
 
 84
 Considering the structure of RCRA as a whole, it is clear that Congress has "spoken directly" to the question of when and how information that is required by RCRA may be kept secret. The plain language of the statute subjects the Air Force to its terms and requires certain information about the Air Force's activities to be made public. The statute also creates two exceptions to these requirements, one for trade secrets and the like, the other for agencies exempted by the President. I would read this statute exactly as it is written.
 
 
 85
 Instead, the majority would create a third exception to RCRA's requirement to make inventory reports public: If a department head thinks disclosure might harm national security, then she can withhold information without presidential approval. This makes a presidential exemption mere surplusage and effectively thwarts Congress' attempt to centralize responsibility by making one person accountable for national security exemptions to RCRA. Gone too are Congress' requirements that RCRA exemptions be renewed every single year and that the President report to Congress each January on what exemptions he has issued. Now any department head can refuse to disclose information required by RCRA, they never have to renew this refusal, and nobody reports to our elected representatives. By holding that the state secrets privilege can be invoked even for information that a federal statute requires the Air Force to produce, the majority has flouted the plain language of RCRA and created exactly the kind of wide and invisible diffusion of power that Congress feared when it wrote the presidential exemption.
 
 III.
 
 86
 The majority avoids finding preemption by concluding that the state secrets privilege and the presidential exemption have different purposes, but this argument cannot withstand close scrutiny. The majority states, "the state secrets privilege and [the exemption] have different purposes: one is an evidentiary privilege that allows the government to withhold sensitive information within the context of litigation; the other allows the President to exempt a federal facility from compliance with RCRA's regulatory regime." Maj. op. at 1167-68. But obviously, the phrase "an evidentiary privilege that allows the government to withhold sensitive information within the context of litigation" is a description of what the privilege is, not a description of its purpose. To discover the purpose of the privilege, we need to ask, Why would someone think it is a good idea to let the government withhold sensitive information within the context of litigation? Similarly, the words "allows the President to exempt a federal facility from compliance with RCRA's regulatory regime" describe only what the exemption does. To ascertain the purpose of the exemption, we need to ask, Why would someone think it is a good idea to let the President exempt a federal facility from compliance with RCRA's regulatory regime? Yet these are precisely the questions the majority neither asks nor answers.
 
 
 87
 As to the first question, the Supreme Court has already explained the purpose of the state secrets privilege:
 
 
 88
 It may be stated as a general principle, that public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated. On this principle, suits cannot be maintained which would require a disclosure of the confidences of the confessional, or those between husband and wife, or of communications by a client to his counsel for professional advice, or of a patient to his physician for a similar purpose. Much greater reason exists for the application of the principle to cases of contract for secret services with the government, as the existence of a contract of that kind is itself a fact not to be disclosed.
 
 
 89
 Totten v. United States, 92 U.S. (2 Otto) 105, 107, 23 L.Ed. 605 (1875). See also United States v. Reynolds, 345 U.S. 1, 10, 73 S.Ct. 528, 533, 97 L.Ed. 727 (1953) ("[T]here is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged.").
 
 
 90
 Thus, the purpose of the privilege is to keep state secrets secret. The majority, by contrast, suggests that the privilege has something to do with litigation in particular. See maj. op. at 1168 ("one is an evidentiary privilege that allows the government to withhold sensitive information within the context of litigation ") (emphasis added). It is true that the law of evidence sometimes excludes information for reasons related to litigation. For example, the Federal Rules of Evidence do not permit the introduction of evidence of subsequent remedial measures, offers of compromise, payment of medical expenses, a rape victim's past sexual behavior, as well as evidence of a person's character. Fed.R.Evid. 404, 407, 408, 409, 412. No one thinks that by excluding this evidence from a trial we keep it secret from the world at large. Rather, we exclude this otherwise public information because we fear its impact on a particular trial. Hence, it would be correct to say that these public policy exclusions "withhold sensitive information within the context of litigation" because their purpose is specifically related to the litigation.
 
 
 91
 Entirely different from the public policy exclusions are the common-law evidentiary privileges, such as the attorney-client privilege, the doctor-patient privilege, the husband-wife privilege, and the priest-penitent privilege. These privileges exist not because we fear the impact that certain kinds of information might have on a trial. Rather, we are motivated by a more general social policy goal of keeping certain kinds of information secret. Secret from the court. Secret from the jury. Secret from the world. The evidentiary privileges apply only in litigation for the very simple reason that in ordinary life, people can keep their secrets because they are not compelled to testify or answer discovery requests. But it does not follow that the purpose of these privileges has anything to do with litigation; therefore, it is incorrect to describe the purpose of an evidentiary privilege as "to withhold sensitive information within the context of litigation." The purpose is to withhold sensitive information from the world at large. After all, in our system, litigation is conducted in public and what is introduced as evidence at a trial presumptively passes into the public domain. See, e.g., Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 604-06, 102 S.Ct. 2613, 2618-20, 73 L.Ed.2d 248 (1982); Valley Broadcasting Co. v. United States Dist. Court, 798 F.2d 1289, 1293-94 (9th Cir.1986).
 
 
 92
 It is clear to me, as it was clear to the Supreme Court more than 120 years ago, that the state secrets privilege is motivated by the same general desire for secrecy as are the other evidentiary privileges. It exists not to "withhold sensitive information within the context of litigation," but to withhold it from the world at large.
 
 
 93
 Once the purpose of the state secrets privilege is properly understood, it becomes obvious why the RCRA presidential exemption preempts it. The two provisions have exactly the same purpose. The exemption allows the President to avoid the mandatory disclosure requirements of RCRA, if he determines that it is in the "paramount interests" of the United States to do so. Why does this provision exist? To keep state secrets secret.
 
 
 94
 To be sure, the exemption and the privilege work very differently. The common-law privilege can be claimed by the head of a department, Reynolds, 345 U.S. at 8, 73 S.Ct. at 532, while the exemption may be claimed only by the President. 42 U.S.C. § 6961(a). The exemption must be renewed annually and must be reported to Congress, id., while no such requirements apply to the privilege. The majority argues that the scope of the privilege also differs from that of the exemption: "If a facility has been exempted, for example, a citizen's suit could question whether the exemption was in the paramount interest of the United States, to which the exemption itself would not apply but to which the state secrets privilege might." Maj. op. at 1168.
 
 
 95
 As an initial matter, I doubt that a citizen's suit could actually challenge the President's determination that a RCRA exemption was "in the paramount interest of the United States." That is a classic example of a political question firmly committed to executive discretion. See generally Heckler v. Chaney, 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985) (rejecting judicial review under the Administrative Procedure Act for agency decisions within the "special province of the Executive Branch"); cf. Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962) (rejecting judicial review of constitutional questions when a case cannot be decided "without an initial policy determination of a kind clearly for nonjudicial discretion"). Does the majority really believe that federal judges should tell the President what is, and what is not, "in the paramount interest of the United States?"
 
 
 96
 Regardless, whenever a statute preempts the common law, it is different from the common law it is preempting. Otherwise, we would call it a "codification." The relevant question is whether the statute "speaks directly" to the question previously answered by federal common law, not whether it provides the same answer. United States v. Texas, 507 U.S. 529, 534, 113 S.Ct. 1631, 1634-35, 123 L.Ed.2d 245 (1993). In this case, the presidential exemption and the state secrets privilege speak directly to the same question; therefore, I am unable to join in Part II.B of the majority opinion.
 
 IV.
 
 97
 Under the majority's view, there is a class of information generated under RCRA that could potentially be kept secret under the state secrets privilege, even though no presidential exemption has been issued under RCRA. For that class of information, because the exemption and the privilege speak directly to the same point, I would conclude that the common law privilege is preempted by RCRA's presidential exemption provision.
 
 ATTACHMENT
 APPENDIX I
 
 98
 UNITED STATES DISTRICT COURT DISTRICT OF NEVADA
 
 
 99
 John Doe I, John Doe II, John Doe III, John Doe IV, John Doe
 
 
 100
 V, and John Doe VI, Plaintiffs,
 
 
 101
 v.
 
 
 102
 Carol M. Browner, Administrator, Environmental Protection
 
 
 103
 Agency, Defendant.
 
 
 104
 Civil: CV-S-94-795-PMP.
 
 
 105
 and
 
 
 106
 Helen Frost, John Doe I, John Doe II, John Doe III, John Doe
 
 
 107
 IV, John Doe V, and John Doe VI, Plaintiffs, v. William
 
 
 108
 Perry, Secretary of Defense, Anthony Lake, National Security
 
 
 109
 Adviser, and Sheila Widnall, Secretary of the Air Force, Defendants.
 
 
 110
 Civil: CV-S-94-714-PMP.
 
 
 111
 UNCLASSIFIED DECLARATION AND CLAIM OF MILITARY AND STATE
 
 
 112
 SECRETS PRIVILEGE OF SHEILA E. WIDNALL, SECRETARY
 
 OF THE AIR FORCE
 
 113
 I, SHEILA E. WIDNALL, HEREBY DECLARE THE FOLLOWING TO BE TRUE AND CORRECT:
 
 
 114
 1. Official Duties: I am the Secretary of the United States Air Force and the head of the Department of the Air Force. In that capacity, I exercise the statutory functions specified in section 8013 of Title 10, U.S.Code. I am responsible for the formulation of Air Force policies and programs that are fully consistent with the national security directives of the President and the Secretary of Defense, including those that protect national security information relating to the defense and foreign relations of the United States. As the Secretary of the Air Force, I exercise authority over the operating location near Groom Lake, Nevada, and the information associated with that operating location. As the head of an agency with control over the information associated with the operating location near Groom Lake, I am the proper person to assert the military and state secrets privilege with regard to that information. Under Executive Order 12356, I exercise original TOP SECRET classification authority, which permits me to determine the proper classification of national security information on behalf of the United States. Executive Order No. 12356, Sec. 1.2, 47 Fed.Reg. 20,105 (1982), reprinted in 50 U.S.Code Section 401 (1991); Presidential Order of May 7, 1982, Officials Designated to Classify National Security Information, 50 U.S.Code Section 401 (1991).
 
 
 115
 2. Purpose: This Declaration is made for the purpose of advising the court of the national security interests in and the security classification of information that may be relevant to the above captioned lawsuits. The statements made herein are based on (a) my personal consideration of the matter, (b) my personal knowledge; and (c) my evaluation of information made available to me in my official capacity. I have concluded that release of certain information relevant to these lawsuits would necessitate disclosure of properly classified information about the Air Force operating location near Groom Lake, Nevada. I am satisfied that the information described in the classified Declaration is properly classified. I have further determined that the information described in the classified Declaration, if released to the public, could reasonably be expected to cause exceptionally grave damage to the national security. It is not possible to discuss publicly the majority of information at issue without risking the very harm to the national security that protection of the information is intended to prevent.
 
 
 116
 3. Security Classification: Under Information Security Oversight Office guidance, "[c]ertain information that would otherwise be unclassified may require classification when combined or associated with other unclassified information." (32 CFR 2001.3(a)) Protection through classification is required if the combination of unclassified items of information provides an added factor that warrants protection of the information taken as a whole. This theory of classification is commonly known as the mosaic or compilation theory. The mosaic theory of classification applies to some of the information associated with the operating location near Groom Lake. Although the operating location near Groom Lake has no official name, it is sometimes referred to by the name or names of programs that have been conducted there. The names of some programs are classified; all program names are classified when they are associated with the specific location or with other classified programs. Consequently, the release of any such names would disclose classified information.
 
 
 117
 4. National Security Information: As the head of the agency responsible for information regarding the operating location near Groom Lake, I have determined that information that concerns this operating location and that falls into any of the following categories, is validly classified:
 
 
 118
 a. Program(s) name(s)
 
 
 119
 b. Mission(s);
 
 
 120
 c. Capabilities;
 
 
 121
 d. Military plans, weapons, or operations;
 
 
 122
 e. Intelligence sources and methods;
 
 
 123
 f. Scientific or technological matters;
 
 
 124
 g. Certain physical characteristics;
 
 
 125
 h. Budget, finance, and contracting relationships;
 
 
 126
 i. Personnel matters; and,
 
 
 127
 j. Security sensitive environmental data. The following are examples of why certain environmental data is sensitive to the national security. Collection of information regarding the air, water, and soil is a classic foreign intelligence practice, because analysis of these samples can result in the identification of military operations and capabilities. The presence of certain chemicals or chemical compounds, either alone or in conjunction with other chemicals and compounds, can reveal military operational capabilities or the nature and scope of classified operations. Similarly, the absence of certain chemicals or chemical compounds can be used to rule out operations and capabilities. Revealing the composition of the chemical waste stream provides the same kind of exploitable information as does publishing a list of the chemicals used and consumed. Analysis of waste material can provide critical information on the makeup as well as the vulnerabilities of the material analyzed. Disclosure of such information increases the risk to the lives of United States personnel and decreases the probability of successful mission accomplishment.
 
 
 128
 5. Role of State and Federal-Environmental Agencies: Since 1990, appropriately cleared representatives of Nevada's Department of Conservation and Natural Resources have been authorized access to the operating location near Groom Lake. The state representative's role is and has been to monitor and enforce compliance with environmental laws and regulations and to advise on remedial efforts, if required. Appropriately cleared officers of the U.S. Environmental Protection Agency were recently granted access to the operating location near Groom Lake for inspection and enforcement of environmental laws. Federal inspectors from the Environmental Protection Agency commenced an inspection pursuant to the Solid Waste Disposal Act, commonly referred to as a "RCRA inspection," at the operating location near Groom Lake, Nevada on December 6, 1994. The Air Force has taken these steps to ensure full compliance with all applicable environmental laws. At the same time that the operating location near Groom Lake is being inspected for environmental compliance, it is essential to the national security that steps also be taken to prevent the disclosure of classified information.
 
 
 129
 6. Invoking Military and State Secrets Privilege: It is my judgment, after personal consideration of the matter, that the national security information described in this Declaration and in the classified Declaration, concerning activities at the U.S. Air Force operating location near Groom Lake, Nevada, constitutes military and state secrets. As a result, disclosure of this information in documentary or testimonial evidence must be barred in the interests of national security of the United States. Pursuant to the authority vested in me as Secretary of the Air Force, I hereby invoke a formal claim of military and state secrets privilege with respect to the disclosure of the national security information listed in paragraph four of this Declaration and more fully discussed in the classified Declaration, whether through documentary or testimonial evidence.
 
 
 130
 7. Environmental Compliance: Although I have found it necessary to invoke the military and state secrets privilege, I believe it important to comment on the Air Force's commitment to full compliance with the environmental laws of the United States. Our goal is to be the best possible environmental steward of the lands comprising the Nellis Range. To meet that goal we are cooperating and will continue to cooperate with both federal and state environmental agencies.
 
 
 131
 8. Under penalty of perjury, and pursuant to section 1746 of Title 28, U.S.Code, I certify and declare that the foregoing statements are true and correct.
 
 
 132
 Executed this 21 day of February, 1995, at Arlington, Virginia.
 
 
 133
 /s/ Sheila E. Widnall
 
 Sheila E. Widnall
 Secretary of the Air Force
 
 
 *
 Honorable Harlington Wood, Jr., Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation
 
 
 [1]
 The facility is referred to for purposes of these actions as "the operating location near Groom Lake."
 
 
 [2]
 Kasza v. Browner, No. 96-15535 and 96-15537 proceeds against Carol M. Browner, the Administrator of the United States Environmental Protection Agency. We will refer to her either as the Administrator or the EPA. The named defendants in Frost v. Perry, No. 96-16047, are William Perry, then the Secretary of the Department of Defense; Anthony Lake, then the National Security Advisor; and Sheila Widnall, the Secretary of the Air Force. We will refer to them collectively as the Air Force
 
 
 [3]
 The district court had jurisdiction in Frost pursuant to RCRA Section 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A), and in Kasza, pursuant to RCRA Section 7002(a)(2), 42 U.S.C. § 6972(a)(2). We have jurisdiction pursuant to 28 U.S.C. § 1291
 
 
 [4]
 Each federal agency must compile, publish, and submit to the Administrator (and to the state where the site is located if it has an authorized hazardous waste program) an inventory of each site at which hazardous waste is stored, treated, or disposed of or has been disposed of at any time. RCRA § 3016(a), 42 U.S.C. § 6937(a)
 
 
 [5]
 Widnall's unclassified declaration is recited in full in Appendix I
 
 
 [6]
 The Administrator must annually undertake an inspection of each federal facility for the treatment, storage, or disposal of hazardous waste to enforce compliance with RCRA. RCRA § 3007(c); 42 U.S.C. § 6927(c). The results shall be available to the public, unless trade secret information would be disclosed. RCRA § 3007(b); 42 U.S.C. § 6927(b). If an agency fails to provide the hazardous waste inventory required by § 3016, § 3016(b) obligates the Administrator to "carry out the inventory program for such agency." 42 U.S.C. § 6937(b). The Administrator also must share with the state information she has received on hazardous waste sites. RCRA § 3012(a); 42 U.S.C. § 6933(a)
 
 
 [7]
 The declarants are Barry N. Breen, Director of EPA's Federal Facilities Enforcement Office, and Elliott P. Laws, Assistant Administrator of EPA's Office of Solid Waste and Emergency Response
 
 
 [8]
 The relevant language in § 6001(a) provides in full:
 The President may exempt any solid waste management facility of any department, agency, or instrumentality in the executive branch from compliance with such a requirement if he determines it to be in the paramount interest of the United States to do so. No such exemption shall be granted due to lack of appropriation unless the President shall have specifically requested such appropriation as a part of the budgetary process and the Congress shall have failed to make available such requested appropriation. Any exemption shall be for a period not in excess of one year, but additional exemptions may be granted for periods not to exceed one year upon the President's making a new determination. The President shall report each January to the Congress all exemptions from the requirements of this section granted during the preceding calendar year, together with his reason for granting each such exemption.
 42 U.S.C. § 6961(a).
 
 
 [9]
 The one argument Frost makes that might make a difference has to do with the district court's holding that an Air Force manual she says was publicly available, and material, was improperly withheld from evidence. However, the argument lacks merit, as the district court did not clearly err in finding that the manual was classified. Frost's related contentions about abuse of the privilege, including that submission of the manual led to a "court seal" over her counsel's office, lack any basis in the record
 
 
 [10]
 The district court cited 28 U.S.C. § 519, to this effect. Section 519 states:
 Except as otherwise authorized by law, the Attorney General shall supervise all litigation to which the United States, an agency, or officer thereof is a party, and shall direct all United States attorneys, assistant United States attorneys, and special attorneys appointed under section 543 of this title in the discharge of their respective duties.
 
 
 [11]
 We assume without deciding that the Nevada Supreme Court Rules govern the conduct of DOJ attorneys appearing in the United States District Court for the District of Nevada. Nevada Supreme Court Rule 157 parallels ABA Model Rule 1.7, and provides:
 
 
 [1]
 A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless
 (a) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
 (b) Each client consents, preferably in writing, after consultation.
 
 
 [2]
 A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
 (a) The lawyer reasonably believes the representation will not be adversely affected; and
 (b) The client consents, preferably in writing, after consultation.
 When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.
 
 
 [12]
 Kasza further argues that the district court should not have denied her a continuance for more discovery before hearing EPA's motion for summary judgment, but we need not reach this issue in light of our conclusion that her claims for relief are moot
 
 
 [13]
 This ruling is the subject of EPA's cross-appeal, which we discuss in Part IV, infra at 116. We will also, however, dismiss the cross-appeal as moot
 
 
 [14]
 The President renewed this exemption on September 28, 1996 and September 26, 1997. See Presidential Determination 96-54, 61 Fed.Reg. 52,679 (Oct. 8, 1996) and Presidential Determination 97-35, 62 Fed.Reg. 52647 (Oct. 8, 1997)
 
 
 [15]
 Section 793(d) imposes a fine of not more than $10,000 and not more than 10 years imprisonment on individuals who give classified information "to any person not entitled to receive it."
 
 
 [16]
 KLAS filed an amicus curiae brief in Frost's appeal
 
 
 [17]
 See Kasza v. Browner, 932 F.Supp. 254 (D.Nev.1996)
 
 
 [1]
 I use the same short-form references as the majority
 
 
 [2]
 It is important to note that, in any event, RCRA would not preempt the common law privilege in those areas to which RCRA does not "directly" speak. For example, it would appear that certain categories of information as to which the state secrets privilege is claimed are not within RCRA's scope. Of the 10 categories of information as to which the privilege is claimed, see Maj. Op. at 1168-69 & App. I at p 4, only one--"security sensitive environmental data"--would appear to be preempted by the RCRA exemption