**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BINYAM MOHAMED; ABOU ELKASSIM
BRITEL; AHMED AGIZA; MOHAMED
FARAG AHMAD BASHMILAH; BISHER
AL-RAWI,
                 *Plaintiffs-Appellants,*

v.

JEPPESEN DATAPLAN, INC.,
                 *Defendant-Appellee,*

UNITED STATES OF AMERICA,
                 *Intervenor-Appellee,*

No. 08-15693

D.C. No.
5:07-CV-02798-JW

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, Presiding

Argued and Submitted
February 9, 2009—San Francisco, California

Filed April 28, 2009
Amended August 31, 2009

Before: Mary M. Schroeder, William C. Canby, Jr. and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge Hawkins

12077

**COUNSEL**

Ben Wizner, American Civil Liberties Union Foundation, New York, New York, for Plaintiffs-Appellants.

Daniel P. Collins, Munger, Tolles & Olson, Los Angeles, California, for Defendant-Appellee.

Douglas N. Letter and Michael P. Abate, Civil Division, United States Department of Justice, Washington, D.C., for Intervenor-Appellee.

Andrew G. McBride, Wiley Rein, LLP, Washington, D.C., for Amicus The Foundation for the Defense of Democracies in Support of Appellees Supporting Affirmance.

Richard A. Samp, Washington Legal Foundation, Washington, D.C., for Amici Washington Legal Foundation and Allied Educational Foundation.

William J. Aceves, California Western School of Law, San Diego, California, for Amici Redress and The International Commission of Jurists.

Natalie L. Bridgeman, Law Offices of Natalie L. Bridgeman, San Francisco, California, for Amici Professors of Constitutional Law, Federal Jurisdiction, and Foreign Relations Law.

Jean-Paul Jassy, Bostwick & Jassy, Los Angeles, California, for Amici Professors William G. Weaver and Robert M. Pallitto.

James M. Ringer, Clifford Change US, New York, New York, for Amici Commonwealth Lawyers Association and JUSTICE.

David J. Stankiewicz, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, New York, New York, for Amicus Former United States Diplomats.

---

## ORDER

The Opinion filed April 28, 2009, slip op. 4919, is hereby amended as follows:

On page 4944, lines 2-6:

<It follows that, while classification may be a strong indication of secrecy as a practical matter, courts must undertake

an independent evaluation of any evidence sought to be excluded to determine whether its contents are secret within the meaning of the privilege.> is replaced with

<It follows that, while classification may be a strong indication of secrecy as a practical matter, courts must independently evaluate each claim of privilege to determine whether it implicates "secrets" within the meaning of the doctrine.8/>

Footnote <8> reads as follows:

<*Reynolds* left open the possibility that, in undertaking this evaluation, a court may determine that some evidence is so sensitive that it should uphold a claim of privilege without examining the evidence in chambers. *See Reynolds*, 345 U.S. at 10 ("[W]e will not go so far as to say that the court may automatically require complete disclosure to the judge before the claim of privilege will be accepted in any case."). We are satisfied, however, that no such showing has been made in this case at this stage in the litigation. Indeed, the government has readily made available, for in camera inspection, the classified declarations that form the basis of the present claim of privilege.>

On page 4947, lines 27-30:

<Thus neither the Federal Rules nor *Reynolds* would permit us to dismiss this case at the *pleadings stage* on the basis of an evidentiary privilege that must be invoked *during discovery* or *at trial*.> is replaced with

<Thus neither the Federal Rules nor *Reynolds* would permit us to dismiss this case for "failure to state a claim upon which relief can be granted," Fed. R. Civ. Pro. 12(b)(6), on the basis of an evidentiary privilege relevant, not to the sufficiency of the *complaint*, but only to the sufficiency of evidence later available to *substantiate* the complaint.9/>

Footnote <9> reads as follows:

<While the government styled its motion below as a "Motion to Dismiss or, in the Alternative, for Summary Judgment," the district court did not grant summary judgment, but rather dismissal—and it could not have done otherwise. A party is entitled to summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." Fed. R. Civ. Pro. 56(c). Here, because Jeppesen has not even answered the complaint, it is uncertain which allegations are in dispute, much less which disputes might raise genuine issues of material fact.

The procedural posture of this case thus differs fundamentally from that in *Kasza*, which involved a grant of summary judgment. *See Frost v. Perry*, 191 F. Supp. 1459, 1465-67 (D. Nev. 1996), *aff'd sub nom Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998) (granting summary judgment because "the privilege, as invoked, covered various items of discovery requested by Plaintiffs," including "various photographic exhibits" and "under seal . . . affidavits," and therefore "Plaintiffs have failed to establish a genuine issue as to any material fact without running afoul of the military and state secrets privilege").>

Defendant-Appellee's Petition for Rehearing and Rehearing En Banc, filed June 12, 2009, and Intervenor-Appellee's Petition for Rehearing or Rehearing En Banc, filed June 12, 2009, remain pending before this court.

Future petitions for rehearing or rehearing en banc from this Order will not be entertained.

**OPINION**

HAWKINS, Circuit Judge:

Plaintiffs Binyam Mohamed, Abou Elkassim Britel, Ahmed Agiza, Mohamed Farag Ahmad Bashmilah, and Bisher al-Rawi ("plaintiffs"), appeal the dismissal of this action, brought under the Alien Tort Statute, 28 U.S.C. § 1350, against Jeppesen Dataplan, Inc. ("Jeppesen"), a wholly owned subsidiary of the Boeing Company. Before Jeppesen filed an answer to the complaint, the United States intervened, asserting that the state secrets privilege required dismissal of the entire action on the pleadings. The district court agreed and dismissed the complaint. On appeal, plaintiffs argue the district court misapplied the state secrets doctrine and erred in dismissing the complaint.

Concluding that the subject matter of this lawsuit is not a state secret because it is not predicated on the existence of a secret agreement between plaintiffs and the Executive, and recognizing that our limited inquiry under Federal Rule of Civil Procedure 12(b)(6) precludes prospective consideration of hypothetical evidence, we reverse and remand.

## I.  BACKGROUND

### A.  Factual Background

At this stage in the litigation, we "construe the complaint in the light most favorable to the plaintiff[s], taking all [their] allegations as true and drawing all reasonable inferences from the complaint in [their] favor." *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005).

#### 1.  The Extraordinary Rendition Program

Plaintiffs allege that the United States Central Intelligence Agency ("CIA"), working in concert with other government

agencies and officials of foreign governments, operated an "extraordinary rendition program" to gather intelligence by apprehending foreign nationals suspected of involvement in terrorist activities and transferring them in secret to foreign countries for detention and interrogation by United States or foreign officials. According to plaintiffs, this program has allowed agents of the United States government "to employ interrogation methods that would [otherwise have been] prohibited under federal or international law."

Citing publicly available evidence, plaintiffs, all foreign nationals, claim they were each processed through the extraordinary rendition program.

Plaintiff Agiza, an Egyptian national who had been seeking asylum in Sweden, was captured by Swedish authorities, transferred to American custody, and flown to Egypt. In Egypt, he was held for five weeks "in a squalid, windowless, and frigid cell," where he was "severely and repeatedly beaten" and subjected to electric shock through electrodes attached to his ear lobes, nipples, and genitals. Agiza was held in detention for two and a half years, after which he was given a six-hour trial before a military court, convicted, and sentenced to fifteen years in Egyptian prison. According to plaintiffs, "[v]irtually every aspect of Agiza's rendition, including his torture in Egypt, has been publicly acknowledged by the Swedish government."

Plaintiff Britel, a forty-year-old Italian citizen of Moroccan origin, was arrested and detained in Pakistan on immigration charges. After several months in Pakistani detention, Britel was transferred to the custody of American officials. These officials dressed Britel in a diaper and overalls, and shackled and blindfolded him for a flight to Morocco. Once in Morocco, he was detained incommunicado by Moroccan security services at the Temara prison. There, he was beaten, deprived of sleep and food, and threatened with sexual torture, including sodomy with a bottle and castration. After

being released and re-detained, Britel was coerced into signing a false confession, convicted of terrorism-related charges, and sentenced to fifteen years in Moroccan prison.

Plaintiff Mohamed, a twenty-eight-year-old Ethiopian citizen and legal resident of the United Kingdom, was arrested in Karachi, Pakistan, on immigration charges. Mohamed was flown to Morocco under similar conditions, where he was transferred to the custody of Moroccan security agents. Moroccan authorities subjected Mohamed to "severe physical and psychological torture," including routinely beating him and breaking his bones. Authorities also cut him with a scalpel all over his body, including on his penis, and poured "hot stinging liquid" into the open wounds. He was also blindfolded and handcuffed while being made "to listen to extremely loud music day and night." After eighteen months in Moroccan custody, Mohamed was transferred back to American custody and flown to Afghanistan. There he was detained in a CIA "dark prison" where he underwent further torture, including being kept in "near permanent darkness" and subjected to loud noise, such as the screams of women and children, for twenty-four hours per day. His captors also deprived him of food. Eventually, Mohamed was transferred to the military prison at Guantanamo Bay, Cuba, where he remained for nearly five years. He was released and returned to the United Kingdom during the pendency of this appeal.

Plaintiff al-Rawi, a thirty-nine-year-old Iraqi citizen and legal resident of the United Kingdom, was arrested in Gambia while traveling on "legitimate" business. Like the other plaintiffs, al-Rawi was placed in a diaper, overalls, and shackles and placed on an airplane, where he was flown to Afghanistan. Detained in the same "dark prison" as Mohamed, loud noises were played twenty-four hours per day to deprive him of sleep. Al-Rawi was eventually transferred to Bagram Air Base, where he was "subjected to humiliation, degradation, and physical and psychological torture by U.S. officials," including being beaten, deprived of sleep, and threatened with

death. Al-Rawi was eventually transferred to Guantanamo; in preparation for the flight, he was "shackled and handcuffed in excruciating pain" as a result of his beatings. Al-Rawi was eventually released from Guantanamo and returned to the United Kingdom.

Plaintiff Bashmilah, a thirty-nine-year-old Yemeni citizen, was apprehended by agents of the Jordanian government while he was visiting Jordan to assist his ailing mother. After a brief detention during which he was "subject to severe physical and psychological abuse," Bashmilah was given over to agents of the United States government, who flew him to Afghanistan in similar fashion as the other plaintiffs. Once in Afghanistan, Bashmilah was placed in solitary confinement, in twenty-four-hour darkness, where he was deprived of sleep and shackled in painful positions. He was subsequently moved to another cell where he was held in twenty-four-hour light and loud noise. Depressed by his conditions, Bashmilah attempted suicide three times. Later, Bashmilah was transferred by airplane to an unknown CIA "black site" prison, where he "suffered sensory manipulation through constant exposure to white noise, alternating with deafeningly loud music" and twenty-four-hour light. Bashmilah was transferred once more to Yemen, where he was tried and convicted of a trivial crime, sentenced to time served abroad, and released.

### 2.   *Jeppesen's Involvement in the Rendition Program*

According to plaintiffs, publicly available evidence establishes that Jeppesen provided flight planning and logistical support services to the aircraft and crew on all of the flights transporting the five plaintiffs among their various locations of detention and torture. According to the complaint, "Jeppesen played an integral role in the forced" abductions and detentions. It "provided direct and substantial services to the United States for its so-called 'extraordinary rendition' program," thereby "enabling the clandestine and forcible transportation of terrorism suspects to secret overseas detention

facilities." Jeppesen furthermore provided this assistance with actual or constructive "knowledge of the objectives of the rendition program," including knowledge that the plaintiffs "would be subjected to forced disappearance, detention, and torture" at the hands of U.S. and foreign government officials.[1]

## B.  Procedural Background

Plaintiffs brought suit under the Alien Tort Statute, 28 U.S.C. § 1350, claiming that Jeppesen is directly liable in damages for (1) actively participating in their forcible and arbitrary abduction, and (2) conspiring in their torture and other cruel, inhuman, or degrading treatment, in violation of customary international law cognizable under the Alien Tort Statute.

In the alternative, plaintiffs assert that Jeppesen is liable for aiding and abetting agents of the United States, Morocco, Egypt, and Jordan in subjecting them to torture and other cruel, inhuman, or degrading treatment because Jeppesen knew or should have known that the passengers of each flight for which it provided logistical support services were being subjected to such treatment by agents of those countries. They further allege in the alternative that Jeppesen demonstrated reckless disregard as to whether the passengers of each flight for which it provided logistical support services were being subjected to torture and other cruel, inhuman, or degrading treatment.

---

[1]Plaintiffs cite, among other things, the sworn declaration of Sean Belcher, a former Jeppesen employee, who stated that the director of Jeppesen International Trip Planning Services, Bob Overby, had told him, " 'We do all the extraordinary rendition flights,' " which he also referred to as " 'the torture flights' " or "spook flights." Belcher stated that "there were some employees who were not comfortable with that aspect of Jeppesen's business" because they knew " 'some of these flights end up' " with the passengers being tortured. He stated that Overby had explained, " 'that's just the way it is, we're doing them' " because "the rendition flights paid very well."

Before Jeppesen answered the complaint, the United States government intervened, asserting the state secrets privilege and, on that basis, moved for dismissal. Then-director of the CIA, General Michael Hayden, filed two declarations in support of the motion to dismiss, one classified, the other redacted and unclassified. The public declaration asserts that "[d]isclosure of the information covered by this privilege assertion reasonably could be expected to cause serious—and in some instances, exceptionally grave—damage to the national security of the United States and, therefore, the information should be excluded from any use in this case."

The district court granted the motions both to intervene and to dismiss, explaining:

> The invocation of states secret privilege is a categorical bar to a lawsuit under the following circumstances: (1) if the very subject matter of the action is a state secret; (2) if the invocation of the privilege deprives a plaintiff of evidence necessary to prove a *prima facie* case; and (3) if the invocation of the privilege deprives a defendant of information necessary to raise a valid defense.

In its view, "inasmuch as the case involves 'allegations' about the conduct by the CIA, the privilege is invoked to protect information which is properly the subject of state secrets privilege." Moreover, "at the core of Plaintiffs' case against Defendant Jeppesen are 'allegations' of covert U.S. military or CIA operations in foreign countries against foreign nationals—clearly a subject matter which is a state secret." Holding that "the very subject matter of this case is a state secret," the district court expressly declined to reach whether invocation of the privilege would deprive plaintiffs of evidence necessary to establish a prima facie case or Jeppesen of evidence necessary to mount a valid defense. Plaintiffs timely appealed.

## II.    STANDARD OF REVIEW

We review de novo the interpretation and application of the state secrets privilege and review for clear error the district court's underlying factual findings. *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1196 (9th Cir. 2007).

## III.    DISCUSSION

### A.    Overview

**[1]** Two parallel strands of the state secrets doctrine have emerged from its relatively thin history. *Totten v. United States*, 92 U.S. 105 (1875), perhaps the earliest case to turn on state secrets in any form, stands for the proposition that a suit predicated on the existence and content of a secret agreement between a plaintiff and the government must be dismissed on the pleadings because the "very subject matter" of the suit is secret. In that case, William Lloyd's estate brought suit against the government to recover compensation for services that Lloyd had allegedly rendered as a spy during the Civil War. *Id.* at 105. Lloyd claimed to have performed on the contract, but not to have received full payment for his services according to the terms of the agreement. *Id.* at 106.

Dismissing the case on the pleadings, the Supreme Court observed that the secrecy of the parties' relationship was a "condition of the engagement" and "[b]oth employer and agent must have understood that the lips of the other were to be for ever sealed respecting the relation of either to the matter." *Id.* This condition of secrecy, the Court reasoned, is "implied in all secret employments of the government in time of war, or upon matters affecting our foreign relations." *Id.* "The publicity produced by an action" to enforce the conditions of any such agreement, moreover, "would itself be a breach of a contract of that kind, and thus defeat a recovery." *Id.* Because "the existence of a contract of that kind is itself a fact not to be disclosed," *id.* at 107, "the very subject matter of the

action . . . [is] a matter of state secret," and the action must therefore be "dismissed on the pleadings without ever reaching the question of evidence," *United States v. Reynolds*, 345 U.S. 1, 11 n.26 (1953) (citing *Totten*).[2]

[2] In contrast with the *Totten* bar, the *Reynolds* evidentiary privilege prevents only discovery of secret evidence when disclosure would threaten national security. *See Reynolds*, 345 U.S. 1.[3]  Application of the *Reynolds* privilege involves a "formula of compromise" in which the court must weigh "the circumstances of the case" and the interests of the plaintiff against the "danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." *Id.* at 9-10. While the court should "defer to the Executive on matters of foreign policy and national security" in making this determination, *Al-Haramain*, 507 F.3d at 1203, "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers," *Reynolds*, 345 U.S. at 9-10. The court must therefore undertake an independent evaluation of the claim of privilege to ensure the privilege properly applies. Once the

---

[2]The courts of appeals have generally interpreted the *Totten* bar as a rule of non-justiciability. *See, e.g.*, *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008) (discussing the "the justiciability doctrine of *Totten v. United States*"); *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 650 n.2 (6th Cir. 2007) (the *Totten* rule is a "rule of non-justiciability"); *Al-Haramain*, 507 F.3d at 1197 (the *Totten* rule is "a rule of non-justiciability, akin to a political question").

[3]The evidentiary version of the privilege appeared for the first time in this Nation during Aaron Burr's 1807 trial for treason, where the district court considered entry of a letter asserted by the government to contain a "matter which ought not to be disclosed." *United States v. Burr*, 25 F. Cas. 30, 37 (C.C. Va. 1807). While the court acknowledged that "there may be matter, the production of which the court would not require," it concluded that "[t]here is certainly nothing before the court which shows that the letter in question contains any matter the disclosure of which would endanger the public safety" and permitted entry of the letter. *Id*; *see also Reynolds*, 345 U.S. at 532 ("[The *Reynolds*] formula received authoritative expression in this country as early as the Burr trial.").

court determines a claim of privilege is legitimate, however, "even the most compelling [personal] necessity cannot overcome" it. *Reynolds*, 345 U.S. at 11.

**[3]** Successful invocation of the *Reynolds* privilege does not necessarily require dismissal of the entire suit. Instead, invocation of the privilege requires " 'simply that the evidence is unavailable, as though a witness had died [or a document had been destroyed], and the case will proceed accordingly, with no consequences save those resulting from the loss of evidence.' " *Al-Haramain*, 507 F.3d at 1204 (quoting *Ellsberg v. Mitchell*, 709 F.2d 51, 64 (D.C. Cir. 1983)). Within the *Reynolds* framework, the "litigation can proceed," therefore, so long as (1) "the plaintiffs can prove 'the essential facts' of their claims 'without resort to [privileged evidence],' " *id.* (quoting *Reynolds*, 345 U.S. at 11), and (2) invocation of the privilege does not deprive "the defendant of information that would otherwise give the defendant a valid defense," *Kasza v. Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998).

## B.   *Totten* **and the Subject Matter of the Lawsuit**

Jeppesen, and to a lesser degree the government, argue that *Totten*'s categorical bar prevents litigation of this case altogether because it, like the suit in *Totten*, is predicated on the existence of an alleged secret agreement with the government. Neither *Totten*'s facts nor its logic supports that conclusion.

**[4]** In the first place, not all of plaintiffs' theories of liability require proof of a relationship between Jeppesen and the government. Their claims, for example, that Jeppesen acted with reckless disregard for whether the passengers it helped transport would be tortured by agents of the United States, Morocco, Egypt, and Jordan, do not necessarily require establishing that the United States operated an extraordinary rendition program, much less that Jeppesen entered into a secret agreement with the government to assist in such a program.

These claims require proof only that Jeppesen provided support for the flights on which the five plaintiffs were flown with actual or imputed knowledge that the passengers would be tortured at their destinations.

[5] *Totten* also does not bar any of plaintiffs' other causes of action because its plain language requires *they* (not Jeppesen) have an "agreement" or "contract" with the government, and an "underst[anding]" that "the lips of the other were to be for ever sealed respecting the relation." *Totten*, 92 U.S. at 106. Only then would "[t]he secrecy which such contracts impose preclude[ ] any action for their enforcement." *Id*. On facts similar to those in *Totten* itself, *Tenet v. Doe*, 544 U.S. 1 (2005), recently confirmed that *Totten* prohibits only suits that would necessarily reveal "the *plaintiff*'s [secret] relationship with the Government." *Id*. at 10 (emphasis added).

[6] While it is conceivable, therefore, that the government could assert a *Totten* argument against Jeppesen if sued by Jeppesen to enforce an alleged clandestine contract between Jeppesen and the government, *Totten* has no bearing here, where third-party plaintiffs (not Jeppesen) seek compensation from Jeppesen (not the government) for tortious detention and torture (not unpaid espionage services). *Totten*'s logic simply cannot stretch to encompass cases brought by third-party plaintiffs against alleged government contractors for the contractors' alleged involvement in tortious intelligence activities.[4] Nothing the plaintiffs have done supports a conclusion that

---

[4]*See Terkel v. AT&T Corp.*, 441 F. Supp. 2d 899, 907 (N.D. Ill. 2006) (refusing to apply *Totten* because "the plaintiffs in this case were not parties to the alleged contract nor did they agree to its terms; rather, they claim that the performance of an alleged contract entered into by others would violate their statutory rights"); *ACLU v. Nat'l Sec. Agency*, 438 F. Supp. 2d 754, 763 (E.D. Mich. 2006) (refusing to apply *Totten* because it "applies [only] to actions where there is a secret espionage relationship between the Plaintiff and the Government"), *vacated on other grounds*, 493 F.3d 644 (6th Cir. 2007).

their "lips [are] to be for ever sealed respecting" the claim on which they sue, such that filing this lawsuit would in itself defeat recovery. *See Totten*, 92 U.S. at 106.

**[7]** Neither does any Ninth Circuit or Supreme Court case law indicate that the "very subject matter" of any other kind of lawsuit is a state secret, apart from the limited factual context of *Totten* itself. The Supreme Court's "very subject matter" language appeared in a footnote in *Reynolds*, where the Court simply characterized "the very subject matter of the [*Totten* lawsuit], a contract to perform espionage, [as] a matter of state secret." *Reynolds*, 345 U.S. at 11 n.26. That brief passage did not signal a deliberate expansion of *Totten*'s uncompromising dismissal rule beyond secret agreements with the government, and we decline to adopt that expansion here.[5] *Tenet* leaves no doubt that the "sweeping holding in *Totten*" applies only to suits "where success depends on the existence of [the plaintiff's] secret espionage relationship with the Government," and that the state secrets privilege does not otherwise "provide the absolute protection" from suit available exclusively under "the *Totten* rule." *Tenet*, 544 U.S. at 8-9, 11.

---

[5]The government's argument that *Kasza*, 133 F.3d 1159, has already recognized that the subject matter of a lawsuit is a state secret outside the *Totten* context any time secret information "is at the core" of the plaintiff's claims, is wrong. In that case, we affirmed dismissal according to the *Reynolds* evidentiary framework because, after the privilege had been asserted with respect to *evidence during discovery*, we concluded that "the state secrets privilege bar[s the plaintiff] from establishing her *prima facie* case on any of her eleven claims," and that "[n]o protective procedure can salvage [the plaintiff]'s suit." 133 F.3d at 1170. *Kasza*'s off-handed "very subject matter" comment thus appears to be superfluous dictum. Indeed, we have already clarified that *Kasza* does no more than "confirm that some cases are, indeed, non-justiciable as a consequence of the very subject matter of the action being a state secret," and that it otherwise "provides scant guidance" for applying the state secrets privilege. *Al-Haramain*, 507 F.3d at 1200.

**[8]** This narrow construction of the *Totten* "very subject matter" bar heeds the Supreme Court's warning that " 'occasion[s] for constitutional confrontation between the [executive and judicial] branches,' should be avoided whenever possible." *Cheney v. United States Dist. Court for Dist. of Columbia*, 542 U.S. 367, 389 (2004) (quoting *United States v. Nixon*, 418 U.S. 683, 692 (1974)).

At base, the government argues here that state secrets form the subject matter of a lawsuit, and therefore require dismissal, any time a complaint contains allegations, the truth or falsity of which has been classified as secret by a government official. The district court agreed, dismissing the case exclusively because it "involves 'allegations' about [secret] conduct by the CIA." This sweeping characterization of the "very subject matter" bar has no logical limit—it would apply equally to suits by U.S. citizens, not just foreign nationals; and to secret conduct committed on U.S. soil, not just abroad. According to the government's theory, the Judiciary should effectively cordon off all secret government actions from judicial scrutiny, immunizing the CIA and its partners from the demands and limits of the law.

**[9]** We reject this interpretation of the "very subject matter" concept, not only because it is unsupported by the case law, but because it forces an unnecessary zero-sum decision between the Judiciary's constitutional duty "to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), and the Executive's constitutional duty "to preserve the national security," *United States v. Valenzuela-Bernal*, 458 U.S. 858, 880 (1982). We simply need not place the "co-equal branches of the Government" on an all-or-nothing "collision course." *Cheney*, 542 U.S. at 389.

**[10]** To be sure, all Presidential "claims of confidentiality and autonomy . . . push[ ] to the fore difficult questions of separation of powers and checks and balances." *Cheney*, 542 U.S. at 389. Here, as in all such cases, "[t]he Judiciary is

forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives." *Id*. But in the state secrets context, the difficulty of that task and the violence of the collision are both substantially less extreme within the *Reynolds* evidentiary framework, when both branches are made to engage in a "formula of compromise," 345 U.S. at 10, rather than by application of the winner-takes-all *Totten* rule.

**[11]** Within the *Reynolds*'s framework, the President's interest in keeping state secrets *secret* is, of course, still protected: the court must balance "the circumstances of the case" and the plaintiff's "showing of necessity" for the evidence against the "danger that compulsion of evidence will expose matters which, in the interest of national security, should not be divulged." *Id*. 10-11. Where a plaintiff's need for the evidence is "strong . . ., the claim of privilege should not be lightly accepted," but "even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied" that the privilege applies. *Id*. at 11.

**[12]** By excising secret evidence on an item-by-item basis, rather than foreclosing litigation altogether at the outset, however, *Reynolds* recognizes that the Executive's national security prerogatives are not the only weighty constitutional values at stake: while "[s]ecurity depends upon a sophisticated intelligence apparatus," it "subsists, too, in fidelity to freedom's first principles [including] freedom from arbitrary and unlawful restraint and the personal liberty that is secured by adherence to the separation of powers." *Boumediene v. Bush*, 128 S. Ct. 2229, 2277 (2008). The Constitution " 'protects us from our own best intentions,' " in other words, by " 'divid[ing] power . . . among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.' " *Printz v. United States*, 521 U.S. 898, 933 (1997) (quoting *New York v. United States*, 505 U.S. 144, 187 (1992)).

Separation-of-powers concerns take on an especially important role in the context of secret Executive conduct. As the Founders of this Nation knew well, arbitrary imprisonment and torture under any circumstance is a " 'gross and notorious . . . act of despotism.' " *Hamdi v. Rumsfeld*, 542 U.S. 507, 556 (2004) (Scalia, J., dissenting) (quoting 1 *Blackstone* 131-33 (1765)). But " 'confinement [and abuse] of the person, by *secretly* hurrying him to [prison], where his sufferings are unknown or forgotten; is a less public, a less striking, and therefore a more dangerous engine of arbitrary government.' " *Id.* (Scalia, J., dissenting) (quoting 1 *Blackstone* 131-33 (1765)) (emphasis added). Thus it was " 'the central judgment of the Framers of the Constitution' " that "[w]hatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Id.* at 536 (quoting *Mistretta v. United States*, 488 U.S. 361, 380 (1989)).

**[13]** Unlike *Totten*, the *Reynolds* framework accommodates these division-of-powers concerns by upholding the President's secrecy interests without categorically immunizing the CIA or its partners from judicial scrutiny. The structural elements in the Constitution, including the principles of separation of powers and judicial review, therefore strongly favor a narrow construction of the blunt *Totten* doctrine and a broad construction of the more precise *Reynolds* privilege. Accordingly, we conclude that if a lawsuit is not predicated on the existence of a secret agreement between the plaintiff and the government, *Totten* does not apply, and the subject matter of the suit is not a state secret. Here, plaintiffs have not sued the government to enforce an alleged secret agreement between themselves and the Executive Branch. The subject matter of this action therefore is not a state secret, and the case should not have been dismissed at the outset.

**C.  *Reynolds* and the Evidentiary Privilege**

The government argues that even if the subject matter of this suit is not a state secret, it still must be dismissed at the outset according to the *Reynolds* framework because, in its view, *Reynolds* applies to secret *information* and, here, "[p]rivileged information would be essential for plaintiffs to make out a prima facie case on, and to prove, their claims." *See also* Unclassified Hayden Decl. (because "[d]isclosure of the *information* covered by this privilege assertion reasonably could be expected to" harm national security, "the *information* should be excluded from any use in this case" (emphasis added)). We reject this argument because it misconstrues the object of the state secrets doctrine within the *Reynolds* framework—*Reynolds* applies to evidence, not information.

y14The Supreme Court could not be more clear that "the privilege which protects military and state secrets" is a privilege within "the law of evidence," just like the "analogous privilege, the privilege against self-incrimination." *Reynolds*, 345 U.S. at 7-8. It specifically prevents the "compulsion of . . . evidence," the introduction of which "will expose military matters which, in the interest of national security, should not be divulged." *Reynolds*, 345 U.S. at 10 (emphasis added).

**[15]** Outside the extremely narrow *Totten* context, the state secrets privilege has never applied to prevent parties from litigating the truth or falsity of allegations, or facts, or information simply because the government regards the truth or falsity of the allegations to be secret. Indeed, to conclude that *Reynolds*, like *Totten*, applies to prevent the litigation of allegations, rather than simply discovery of evidence, would be to destroy the distinction between the two versions of the doctrine. According to *Reynolds*, therefore, the question is not which *facts* are secret and may not be alleged and put to the jury's consideration for a verdict; it is only which *evidence* is secret and may not be disclosed in the course of a public trial.

**[16]** To be sure, a court may determine that evidence is subject to the *Reynolds* privilege *because* it contains secret information; nevertheless, the privilege applies to prevent discovery of the evidence itself and not litigation of the truth or falsity of the information that might be contained within it. As the Supreme Court has explained with respect to the attorney-client privilege, for example, invocation of that privilege does not create a "zone of silence" around the contents of privileged communications. *Upjohn Co. v. United States*, 449 U.S. 383, 388 (1981). "The privilege only protects disclosure of [the] communications [themselves]; it does not protect disclosure of the underlying facts," so long as the underlying facts can be proven without resort to the privileged materials. *Id.* at 395.

Other privileges within the law of evidence demonstrate the same common sense principle. The "analogous" Fifth Amendment privilege against self-incrimination, *Reynolds*, 345 U.S. at 8, for instance, " 'may be asserted . . . to resist compelled explicit or implicit disclosures of incriminating information,' " *United States v. Hubbell*, 530 U.S. 27, 34 n.8 (2000) (quoting *Doe v. United States*, 487 U.S. 201, 212 (1988)). Once the privilege is properly invoked, the court cannot compel the testimony. *Id.* But a witness's valid assertion of the privilege does not immunize him from prosecution for the underlying crime, as though the state were precluded by virtue of the privilege from litigating the facts contained within the excluded testimony. It goes without saying that the privilege applies only to the testimony itself, and not to the underlying facts, and that the state therefore may later prosecute the witness for the crimes in question, just " 'with[ ] evidence from another source.' " *Id.* (quoting *Doe*, 487 U.S. at 212).

**[17]** Because the *Reynolds* privilege, like any other evidentiary privilege, " 'extends only to [evidence] and not to facts,' " *Upjohn*, 449 U.S. at 395-96 (quoting *Philadelphia v. Westinghouse Elec. Corp.*, 205 F. Supp. 830, 831 (E.D. Pa. 1962)), it cannot be invoked to prevent a litigant from per-

suading a jury of the truth or falsity of an allegation by reference to non-privileged evidence, regardless whether privileged evidence might also be probative of the truth or falsity of the allegation.

**[18]** As we have previously explained, therefore, the effect of the government's successful invocation of the *Reynolds* privilege " 'is simply that the evidence is unavailable, as though a witness had died [or a document had been destroyed], and the case will proceed accordingly, with no consequences save those resulting from the loss of evidence.' " *Al-Haramain*, 507 F.3d at 1204 (emphasis added) (quoting *Ellsberg*, 709 F.2d at 64); *see also Kasza*, 133 F.3d at 1166 ("[B]y invoking the privilege over particular evidence, the evidence is completely removed from the case. The plaintiff's case then goes forward based on evidence not covered by the privilege." (citing *Reynolds*, 345 U.S. at 11)).[6] Thus, within the *Reynolds* framework, dismissal is justified if and only if specific privileged evidence is itself indispensable to establishing either the truth of the plaintiff's allegations or a valid defense that would otherwise be available to the defendant. *See Kasza*, 133 F.3d at 1166.

---

[6]There is one important difference between the unavailability of evidence under ordinary circumstances as against within the state secrets context. Ordinarily the unavailability of privileged evidence would prevent both plaintiffs and defendants from relying on that evidence to prove their cases. In the state secrets context, however, if the unavailability of privileged evidence prevents the defendant from establishing an otherwise available and valid defense, the court must dismiss the case. *See Kasza*, 133 F.3d at 1166 (if the privilege deprives "the defendant of information that would otherwise give the defendant a valid defense," the case must be dismissed). In this way, the doctrine ensures protection of state secrets by requiring dismissal where defendants would otherwise have strong incentive to improperly disclose state secrets known to them during trial. It also ensures that defendants, like Jeppesen, are not penalized by the government's invocation of the privilege.

**D. The Freedom of Information Act**

Finally, we address when evidence is "secret" within the meaning of the privilege. The government turns to Freedom of Information Act ("FOIA") cases for the proposition that privileged evidence is any evidence containing "classified" information, which remains "secret" unless and until such information has been "officially disclosed" by a high ranking government official. *See Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990); *Afshar v. Dep't of State*, 702 F.2d 1125 (D.C. Cir. 1983); *Phillippi v. CIA*, 655 F.2d 1325 (D.C. Cir. 1981); *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975). According to the government, because there has been no official disclosure or declassification of relevant classified information in this case, any materials containing classified information are necessarily subject to suppression under the privilege.

[19] We find the government's resort to FOIA case law unpersuasive because the FOIA statutory framework takes for granted that "classified" matters relating to national defense and foreign policy are, by virtue of being classified, categorically exempt from disclosures that would otherwise be required under the Act. *See* 5 U.S.C. § 552(b)(1)(A)-(B) (exempting from disclosure under FOIA all "matters that are specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive order").

[20] The state secrets privilege operates according to no such assumption—in fact, *Reynolds* makes clear that "classified" cannot be equated with "secret" within the meaning of the doctrine. If the simple fact that information is classified were enough to bring evidence containing that information within the scope of the privilege, then the entire state secrets inquiry—from determining which matters are secret to which disclosures pose a threat to national security—would fall

exclusively to the Executive Branch, in plain contravention of the Supreme Court's admonition that "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers" without "lead[ing] to intolerable abuses." *Reynolds*, 345 U.S. at 8-10. A rule that categorically equated "classified" matters with "secret" matters would, for example, perversely encourage the President to classify politically embarrassing information simply to place it beyond the reach of judicial process.[7] It follows that, while classification may

---

[7]Abuse of the Nation's information classification system is not unheard of. Former U.S. Solicitor General Erwin Griswold, who argued the government's case in the Pentagon Papers matter, later explained in a *Washington Post* editorial that "[i]t quickly becomes apparent to any person who has considerable experience with classified material that there is massive overclassification, and that the principal concern of the classifiers is not with national security, but rather with governmental embarrassment of one sort or another." Erwin N. Griswold, *Secrets Not Worth Keeping: the Courts and Classified Information*, Wash. Post, Feb. 15, 1989, at A25.

Former Attorney General Herbert Brownell similarly complained in a 1953 letter to President Eisenhower that classification procedures were then "so broadly drawn and loosely administered as to make it possible for government officials to cover up their own mistakes and even their wrongdoing under the guise of protecting national security." Letter from Attorney General Herbert Brownell to President Dwight Eisenhower (June 15,1953) (quoted in Kenneth R. Mayer, *With the Stroke of a Pen: Executive Orders and Presidential Power* 145 (2001)).

Even in *Reynolds*, avoidance of embarrassment—not preservation of state secrets—appears to have motivated the Executive's invocation of the privilege. There the Court credited the government's assertion that "this accident occurred to a military plane which had gone aloft to test secret electronic equipment," and that "there was a reasonable danger that the accident investigation report would contain references to the secret electronic equipment which was the primary concern of the mission." 345 U.S. at 10. In 1996, however, the "secret" accident report involved in that case was declassified. A review of the report revealed, not "details of any secret project the plane was involved in," but "[i]nstead, . . . a horror story of incompetence, bungling, and tragic error." Garry Wills, *Why the Government Can Legally Lie*, 56 N.Y. Rev. of Books 32, 33 (2009). Courts should be concerned to prevent a concentration of unchecked power that would permit such abuses.

be a strong indication of secrecy as a practical matter, courts must independently evaluate each claim of privilege to determine whether it implicates "secrets" within the meaning of the doctrine.[8]

Common sense confirms this conclusion. The government could not seriously argue, for example, that the Pentagon Papers remained "secret" and therefore subject to the state secrets privilege even after having been published in *The New York Times*, simply because the government itself refused to declassify or otherwise "officially disclose" the content of the papers. *See New York Times Co. v. United States*, 403 U.S. 713 (1971).

**[21]** It is also unsurprising that Congress would enact a more deferential scheme under FOIA than exists under the state secrets doctrine, given the substantial differences in the balance of interests involved in the two types of cases. The state secrets doctrine empowers the government to refuse disclosure of secret evidence during the course of a lawsuit that necessarily has an independent purpose apart from disclosure. Plaintiffs here, for example, seek redress against Jeppesen for its alleged complicity in their alleged torture at the hands of foreign agents. Their interest in discovery of all relevant evidence is substantial: "The very essence of civil liberty . . . consists in the right of every individual to claim the protection of the laws, whenever he receives an injury," and "[o]ne of the first duties of government is to afford that protection."

---

[8]*Reynolds* left open the possibility that, in undertaking this evaluation, a court may determine that some evidence is so sensitive that it should uphold a claim of privilege without examining the evidence in chambers. *See Reynolds*, 345 U.S. at 10 ("[W]e will not go so far as to say that the court may automatically require complete disclosure to the judge before the claim of privilege will be accepted in any case."). We are satisfied, however, that no such showing has been made in this case at this stage in the litigation. Indeed, the government has readily made available, for in camera inspection, the classified declarations that form the basis of the present claim of privilege.

*Marbury*, 5 U.S. (1 Cranch) at 163. Disclosure of any evidence containing classified information, but ultimately not subject to the state secrets privilege, would be appropriate only as necessary for plaintiffs to obtain the protection of the laws.

**[22]** By contrast, FOIA entails litigation for the sole and independent purpose of obtaining disclosure of classified information. *See* 5 U.S.C. § 552(a)(4)(B); *see also, e.g.*, *Knopf*, 509 F.2d at 1370 (addressing the court's authority under FOIA to order the disclosure of classified information for publication in a book). While "an informed citizenry [is] vital to the functioning of a democratic society," *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 16 (2001) (internal quotations omitted), we think the balance of interests will more often tilt in favor of the Executive when disclosure is the primary end in itself. FOIA therefore predictably entails greater deference to the national classification system than does the state secrets doctrine.

Given these two relevant differences, the government's invocation of FOIA case law is unpersuasive in the state secrets context. Any argument that the contents of any evidence are and remain categorically secret for purposes of the privilege unless and until the government says otherwise is meritless.

## E.   Conclusion

The government finally urges us to affirm according to *Reynolds* because, in its view, there is "no possibility" that plaintiffs can establish a prima facie case, or that Jeppesen can defend itself, "without using privileged evidence." We are unpersuaded because acceding to the government's request would require us to ignore well-established principles of civil procedure. At this stage in the litigation, we simply cannot prospectively evaluate hypothetical claims of privilege that

the government has not yet raised and the district court has not yet considered.

**[23]** This case is before us on appeal from a Rule 12(b)(6) motion to dismiss. Jeppesen has not filed an answer to the complaint, and discovery has not yet begun. It is well settled that when a federal court reviews the grant of a Rule 12 motion to dismiss, "its task is necessarily a limited one." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). That limited task "is not [to determine] whether a plaintiff will ultimately prevail," *id.*, but instead only whether the complaint "state[s] a claim upon which relief can be granted," Fed. R. Civ. Pro. 12(b)(6). Plaintiffs here have stated a claim on which relief can be granted and therefore should have an opportunity to present evidence in support of their allegations, without regard for the likelihood of ultimate success. *See Scheuer*, 416 U.S. at 236 (a district court acts "prematurely" and "erroneously" when it dismisses a well-pleaded complaint, thereby "preclud[ing] any opportunity for the plaintiffs" to establish their case "by subsequent proof"); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, — (2007) ("[A] well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely.' " (quoting *Scheuer*, 416 U.S. at 236)).

This limited inquiry—a long-standing feature of the Federal Rules of Civil Procedure—serves a sensible judicial purpose. We simply cannot resolve whether the *Reynolds* evidentiary privilege applies without (1) an actual request for discovery of specific evidence, (2) an explanation from plaintiffs of their need for the evidence, and (3) a formal invocation of the privilege by the government with respect to that evidence, explaining why it must remain confidential. *See Reynolds*, 345 U.S. at 8-9 ("the principles which control the application of the privilege" require a "formal claim of privilege" by the government with respect to the challenged evidence); *id.* at 10-11 (the court must consider the litigants' "showing of necessity" for the evidence in determining whether "the occasion for invoking the privilege is appropri-

ate"). Nor can we determine whether the parties will be able to establish their cases without use of privileged evidence without also knowing what *non-privileged* evidence they will marshal. *See Crater Corp. v. Lucent Techs., Inc.*, 423 F.3d 1260, 1267-68 (Fed. Cir. 2005) ("deciding the impact of the government's assertion of the state secrets privilege" before the record is "adequately developed" puts "the cart before the horse"). Thus neither the Federal Rules nor *Reynolds* would permit us to dismiss this case for "failure to state a claim upon which relief can be granted," Fed. R. Civ. Pro. 12(b)(6), on the basis of an evidentiary privilege relevant, not to the sufficiency of the *complaint*, but only to the sufficiency of evidence later available to *substantiate* the complaint.[9]

Our decision to remand also has the additional benefit of conforming with "the general rule . . . that a federal appellate court does not consider an issue not passed on below," and will allow the district court to apply *Reynolds* in the first instance. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976); *see also Johnson v. California*, 543 U.S. 499, 515 (2005) (citing *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 557-58

---

[9]While the government styled its motion below as a "Motion to Dismiss or, in the Alternative, for Summary Judgment," the district court did not grant summary judgment, but rather dismissal—and it could not have done otherwise. A party is entitled to summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." Fed. R. Civ. Pro. 56(c). Here, because Jeppesen has not even answered the complaint, it is uncertain which allegations are in dispute, much less which disputes might raise genuine issues of material fact.

The procedural posture of this case thus differs fundamentally from that in *Kasza*, which involved a grant of summary judgment. *See Frost v. Perry*, 191 F. Supp. 1459, 1465-67 (D. Nev. 1996), *aff'd sub nom Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998) (granting summary judgment because "the privilege, as invoked, covered various items of discovery requested by Plaintiffs," including "various photographic exhibits" and "under seal . . . affidavits," and therefore "Plaintiffs have failed to establish a genuine issue as to any material fact without running afoul of the military and state secrets privilege").

(1994) (reversing and remanding for the lower court to apply the correct legal standard in the first instance)).

**[24]** On remand, the government must assert the privilege with respect to secret evidence (not classified information), and the district court must determine what evidence is privileged and whether any such evidence is indispensable either to plaintiffs' prima facie case or to a valid defense otherwise available to Jeppesen. Only if privileged evidence is indispensable to either party should it dismiss the complaint.

**REVERSED and REMANDED.**